STATE OF CONNECTICUT *v.* MICHAEL WOOTEN
(14419)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and NORCOTT, Js.

678

Argued May 5—decision released September 7, 1993

*Martin Zeldis,* assistant public defender, for the appellant (defendant).

*Leah Hawley,* assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *Edward Narus,* assistant state's attorney, for the appellee (state).

CALLAHAN, J. The defendant, Michael Wooten, was charged with kidnapping in the first degree in violation of General Statutes § 53a-92,[1] sexual assault in the first degree in violation of General Statutes § 53a-70[2] and assault in the third degree in violation of General

---

[1] General Statutes § 53a-92 provides: "(a) A person is guilty of kidnapping in the first degree when he abducts another person and: (1) His intent is to compel a third person (A) to pay or deliver money or property as ransom or (B) to engage in other particular conduct or to refrain from engaging in particular conduct; or (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony; or (C) terrorize him or a third person; or (D) interfere with the performance of a government function.

"(b) Kidnapping in the first degree is a class A felony."

[2] General Statutes § 53a-70 provides in relevant part: "(a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person, or (2) engages in sexual intercourse with a person under thirteen years of age, or (3) commits sexual assault in the second degree as provided in section 53a-71 and in the commission of such offense is aided by two or more other persons actually present."

Statutes § 53a-61.[3] A jury returned a verdict of guilty on the charges of kidnapping in the first degree and assault in the third degree. It was unable, however, to reach a verdict on the charge of sexual assault in the first degree. The trial court, *Miano, J.,* therefore declared a mistrial on that charge and entered judgment in accordance with the verdict on the other charges. The defendant moved for a judgment of acquittal as to all the charges. The trial court denied his motion, and sentenced him to a total effective sentence of seventeen years.[4] The trial court then dismissed the charge of sexual assault in the first degree without prejudice to the state, but subsequently vacated the dismissal and reinstated the charge. The defendant appeals from the judgment of conviction pursuant to General Statutes § 51-199 (b) (3).[5] We affirm the judgment.

A review of the transcript of the defendant's trial reveals the following. On the evening of July 23, 1990, the victim, having arranged for a friend to care for her infant daughter, walked from her home on Ashley Street in Hartford to the Arthur Drug Store on Farm-

[3] General Statutes § 53a-61 provides: "(a) A person is guilty of assault in the third degree when: (1) With intent to cause physical injury to another person, he causes such injury to such person or to a third person; or (2) he recklessly causes serious physical injury to another person; or (3) with criminal negligence, he causes physical injury to another person by means of a deadly weapon, a dangerous instrument or an electronic defense weapon.

"(b) Assault in the third degree is a class A misdemeanor and any person found guilty under subdivision (3) of subsection (a) of this section shall be sentenced to a term of imprisonment of one year which may not be suspended or reduced."

[4] The trial court subsequently reduced the defendant's sentence to thirteen years upon the recommendation of the sentence review board that had reviewed the defendant's petition seeking a reduction in his sentence.

[5] General Statutes § 51-199 (b) (3) provides in relevant part: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years. . . ."

ington Avenue in order to purchase a pacifier and a baby bottle. The victim was able to purchase a pacifier, however, the store did not have a bottle in stock. She was told by an employee, however, that a store on Asylum Avenue might have the item.

At approximately 11 p.m., while walking along Asylum Avenue, the victim was approached by the defendant who asked her for a cigarette. The victim told him that she did not have any cigarettes and walked away. The defendant started to follow her down Asylum Avenue, and then grabbed her by the hair and began pulling her across the street. As the victim was being dragged across Asylum Avenue, two women drove by and heard her cries for help.

The defendant forced the victim into a parking lot located behind a bank just off of Asylum Avenue, and onto a grassy area within the parking lot. Once there, he struck her in the face and legs and threatened to kill her. He then placed a sharp metal object against her neck and forcibly disrobed her.[6] Thereafter he attempted unsuccessfully to coerce the victim to perform fellatio. Failing at that, he compelled her to engage in vaginal intercourse.

While the victim was being assaulted, a passerby, Jose Hernandez, saw the defendant lying on top of the victim engaged in sexual activity. When the defendant saw Hernandez, he quickly stood up, pulled up his pants, and approached Hernandez, explaining that he had paid ten dollars to have sex with the victim. The defendant then abruptly left the scene and ran down Asylum Avenue.

Immediately after the defendant had fled, the police arrived at the scene, having been led there by the two

[6] The victim wore several layers of clothing at the time of the act, including two shirts and four pairs of pants.

women who had previously witnessed the defendant dragging the victim across Asylum Avenue. Hernandez remained at the scene of the crime and gave a description of the assailant to Officer Chris Hopkins, the first police officer to arrive. Hernandez then got into a police car with Hopkins to reconnoiter the area in an attempt to locate the assailant. They first drove west on Asylum Avenue and then north onto Huntington Street. When nearing the intersection of Huntington and Collins Streets, Hernandez saw a heavyset man who, he informed Hopkins, was the man who had assaulted the victim. The defendant was then apprehended and detained by the police on Huntington Street. While the defendant was being held, Hernandez again identified him as the man he had seen assaulting the victim in the bank parking lot. Thereafter, the victim was taken by the police to Huntington Street where the defendant was being detained. There the victim positively identified the defendant as her assailant.

The defendant testified that he had neither kidnapped nor attacked the victim, but that he had been elsewhere at the time the alleged crimes were committed. He, along with alibi witnesses who testified on his behalf, explained that on the evening that the victim was attacked he had been at his sister's house until sometime after 11 p.m., at which time he left and walked to a gas station to purchase cigarettes.

The defendant claims that the trial court improperly: (1) denied his motion to suppress the victim's out-of-court identification; (2) denied his motions for a mistrial, the first made after the victim had unexpectedly identified the defendant in court and the second when the court indicated that it intended to give a curative instruction in replacement of a prior curative instruction; (3) permitted the state to reopen its direct examination of the victim to allow her to make an in-court

identification; (4) refused to instruct the jury that prior inconsistent statements of the victim could be used substantively by the jury in its deliberations; (5) refused to declare a mistrial after a juror communicated with the trial court, and instead gave a "Chip Smith" instruction; and (6) reinstated the charge of sexual assault in the first degree in the defendant's absence, after it had already declared a mistrial as to that charge and had dismissed the charge in open court. We affirm the judgment of the trial court.

I

The defendant first claims that the trial court improperly denied his motion to suppress the victim's out-of-court identification. He argues that the victim's out-of-court identification resulted from an unnecessarily suggestive procedure and was unreliable, and that, as a consequence of its admission, his constitutional rights to due process were violated. We disagree.

At trial, prior to the presentation of the state's case, the trial court held a hearing on the defendant's motion to suppress the victim's out-of-court identification. During the hearing, the victim testified that she remembered her assailant to have been a black male of medium complexion, who was approximately six feet tall and heavyset, who appeared to her to have "Chinese" shaped eyes and to be wearing a white baseball cap and a white shirt. She testified that, although there had been "little light" when she had first seen her assailant approaching her on Asylum Avenue, she had not had any difficulty in seeing him. The victim further stated that she had been face-to-face with her assailant for a few seconds when he had first approached her. In addition, she testified that during the assault she had had a partial view of his face, although she was sick-

ened and frightened by his actions and attempted to avoid looking at him while he was on top of her in the parking lot.[7]

Hernandez, the passerby, also testified during the suppression hearing that he had had no difficulty seeing the man in the parking lot on the evening of the attack. He described him as a heavyset black male who was about six feet tall and two hundred pounds. He further testified that the assailant had been wearing a dirty, white T-shirt, black pants and a dark cap with a team insignia.

After the attack, Carmello Hernandez, a Spanish speaking police officer, was called to the scene in order to assist the victim who spoke only Spanish. Shortly after arriving at the scene, Hernandez drove the victim to her apartment on Ashley Street to check on her daughter. Thereafter, he started to transport the victim and Magaly Franqui, a friend who had offered to accompany the victim, to the hospital. While en route Hernandez received a call over the radio that a suspect had been apprehended. He told the victim that the police had a suspect whom they wished to have her attempt to identify before she went to the hospital.

Consequently, approximately one-half hour after the attack, the victim was taken to where the police were detaining the suspect. There, Hernandez asked the victim to try to identify her assailant and told her not to be frightened. She then exited from the police car operated by Hernandez and, accompanied by Franqui, walked over to the police car in which the suspect was

[7] The victim did not remember giving a description of her assailant to the police on the night of the assault. Officer Chris Hopkins, who testified at the suppression hearing, did state, however, that she had given a description of the assailant to him immediately after the attack. On that evening, she described the assailant to the police as a heavyset, black male who was approximately six feet tall and who wore a T-shirt, dark pants and sneakers. She also mentioned that he "smelled" and appeared unshaven.

seated in the rear seat. The light was on in the car. From a distance of about eight to ten feet, the victim positively identified the suspect as the person who had assaulted her. Although she had been reluctant to attempt the identification, she testified that she was absolutely certain that the person in the police car was her assailant, saying, upon seeing the defendant, "[t]hat's him, that's him." Moreover, the victim testified that no one had coached her to make the identification. At the close of the hearing, the trial court concluded that the victim's identification of the defendant, although suggestive, was not unnecessarily so, and also found it to be reliable under the totality of circumstances.

It is well settled that "[i]n determining whether a pretrial identification procedure violated a defendant's due process rights, 'the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the "totality of the circumstances." ' " *State* v. *Tatum,* 219 Conn. 721, 727, 595 A.2d 322 (1991), quoting *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980); see also *State* v. *Ramsundar,* 204 Conn. 4, 10, 526 A.2d 1311, cert. denied, 484 U.S. 955, 108 S. Ct. 348, 98 L. Ed. 2d 374 (1987). " 'To prevail in his claim "the defendant must demonstrate that the trial court erred in *both* of its determinations regarding 'suggestiveness' and 'reliability' of identifications in the totality of the circumstances." (Emphasis in original.) *State* v. *Hinton,* [196 Conn. 289, 293, 493 A.2d 836 (1985)].' *State* v. *Mayette,* 204 Conn. 571, 581, 529 A.2d 673 (1987)." *State* v. *Pollitt,* 205 Conn. 132, 162, 531 A.2d 125 (1987). Generally, "[t]he exclusion of evidence from the jury is . . . a drastic sanction, one that

is limited to identification testimony which is manifestly suspect." *Harker* v. *Maryland,* 800 F.2d 437, 443 (4th Cir. 1986); *State* v. *Ramsundar,* supra, 13.

The out-of-court identification that the defendant claims was inadmissible is the one-to-one show-up or confrontation between the victim and himself. The defendant correctly notes that "almost any one-to-one confrontation between a victim of a crime and a person whom the police present as a suspect is presumptively suggestive . . ."; (internal quotation marks omitted) *State* v. *Collette,* 199 Conn. 308, 310, 507 A.2d 99 (1986); "because it conveys the message to the victim that the police believe the suspect is guilty." *State* v. *Tatum,* supra, 727.

Here, the one-to-one confrontation between the victim and the defendant was obviously suggestive. The victim must have realized that the defendant, seated alone in the rear of a police car, was a person whom the police at least believed to have had something to do with the crime. Id. The confrontation, although suggestive, was nonetheless not *unnecessarily* so, because "the exigencies of the situation justified the procedure . . . ." *State* v. *Amarillo,* 198 Conn. 285, 293, 503 A.2d 146 (1986). The confrontation was not unnecessary because it was prudent for the police to provide the victim with the opportunity to identify her assailant while her memory of the incident was still fresh; see *State* v. *Middleton,* 170 Conn. 601, 608, 368 A.2d 66 (1976) ("prompt on-the-scene confrontations tend under some circumstances to ensure accuracy"); and because it was necessary to allow the police to "eliminate quickly any innocent parties so as to continue the investigation with a minimum of delay," if the victim excluded the defendant as a suspect or was unable to identify him. *State* v. *Amarillo,* supra, 293. As we have remarked, "[a]n immediate viewing of the suspect may be justified where 'it [is] important for the police to separate the

prime suspect gold from the suspicious glitter, so as to enable them . . . to continue their investigation with a minimum of delay.' " *State* v. *Collette,* supra, 310–11, quoting *State* v. *Maturo,* 188 Conn. 591, 596, 452 A.2d 642 (1982).

The defendant, however, claims that because the victim was still emotionally distraught when she was asked to make the identification, and the passerby, Jose Hernandez, had already made an identification, the exigencies of the situation were not such as to warrant the one-to-one identification procedure. We disagree. If the victim had been unable to identify the defendant or had excluded him as a suspect, the police would have had to continue their investigation despite Hernandez' identification. See *In re Juvenile Appeal (83-EF),* 190 Conn. 428, 437, 461 A.2d 957 (1983). "The immediate viewing enabled the police to focus their investigation and gave them greater assurance that innocent parties were not unjustly detained." *State* v. *Collette,* supra, 311. Moreover, the victim's emotional state goes to the weight to be accorded her identification rather than to the necessity for her prompt identification of her assailant or the admissibility of her identification. See *State* v. *Ledbetter,* 185 Conn. 607, 615, 441 A.2d 595 (1981).

Even if the victim's out-of-court identification were unnecessarily suggestive, however, the identification in this case was nonetheless reliable under the totality of the circumstances. "[R]eliability is the linchpin in determining the admissibility of identification testimony . . . ." *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). To determine whether an identification that resulted from an unnecessarily suggestive procedure is reliable, we must weigh the corrupting effect of the suggestive procedure in light of certain factors such as "the opportunity of the witness to view the criminal at the time of

the crime, the witness' degree of attention, the accuracy of [that person's] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." (Internal quotation marks omitted.) *State v. Theriault,* supra, 373–74; *Manson v. Brathwaite,* supra, 114; *State v. Evans,* 200 Conn. 350, 356, 511 A.2d 1006 (1986).

"[I]n determining whether, despite an unnecessarily suggestive procedure, an identification is reliable, the trial court's observation of witnesses carries less weight than in other fact finding contexts. Accordingly, we examine the legal question of reliability with exceptionally close scrutiny and defer less than we normally do to the related fact finding of the trial court." *State v. Gordon,* 185 Conn. 402, 416, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982); *State v. Ramsundar,* supra, 12.

After a review of the transcript of the suppression hearing and the trial, application of the standard established in *Gordon* and consideration of the *Manson* matrix of factors, we cannot say that the trial court was incorrect when it determined that the one-to-one identification procedure did not result in a substantial likelihood of misidentification. Consequently, the out-of-court identification of the defendant by the victim was sufficiently reliable to be considered by the jury. "Absent a very substantial likelihood of irreparable misidentification, '[w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.' *Manson v. Brathwaite,* supra, 116." *State v. Ramsundar,* supra, 13.[8]

[8] We note that the victim testified that her attacker wore a white baseball cap and that Jose Hernandez testified he wore a dark cap with a team

## II

The defendant next claims that the trial court improperly denied his motions for a mistrial. The first motion was made after the victim unexpectedly identified the defendant in court during her direct examination in the course of the trial. A second motion was made after the court had indicated it would give a curative instruction that would replace a prior curative instruction concerning the victim's in-court identification of the defendant.

The facts underlying this claim are complex. During the hearing on the defendant's motion to suppress outside the presence of the jury, the victim was asked by the state if she could make an in-court identification by pointing out her assailant. She indicated that she could make such an identification and proceeded to point not to the defendant but to Patrick Wooten, the defendant's brother, who was seated in the courtroom. She was then asked by the state, "Is there anyone sitting near him?" In response to that question, she pointed out Samuel Wooten, another brother of the defendant, whom she also appeared to be identifying as her assailant. She then stated that she was confused because her assailant had worn a hat at the time of the assault. Both Samuel and Patrick Wooten were seated behind the defendant, who was seated next to his attorney at the counsel table. The victim thereafter did not attempt to make a further identification of the defendant as her assailant during the course of the suppression hearing.

After the hearing, the court asked whether either the state or the defendant intended to have the victim

insignia. Assuming Hernandez was correct "the trial court could have found that this misstatement did not detract substantially from the reliability of the identification." *State* v. *Amarillo*, 198 Conn. 285, 293–94, 503 A.2d 146 (1986).

attempt an in-court identification of the defendant before the jury. In response, the defendant moved to suppress any such identification, arguing that it would be unreliable. The state told the court that, at that time, it did not intend to attempt to elicit any further in-court identification of the defendant by the victim. The court consequently decided to forgo making a ruling on the defendant's motion to suppress any future in-court identification unless and until the state changed its mind and sought to have the victim make an identification at trial. The court thereupon informed the state that, if it wished to have the victim attempt an in-court identification, the court would have to consider the issue in a hearing out of the presence of the jury.

Nevertheless, at trial before the jury, during the state's direct examination of the victim,[9] she unexpectedly identified the defendant in the following manner:

"[The State:] [A]fter you got onto Asylum Avenue, having taken that short cut, did you meet anyone.

"[The Victim:] Yes.

"Q. Who did you meet?

"A. The one that is sitting next to the gentleman [indicating the defendant]."

The defendant immediately moved for a mistrial. The judge asked the state if it had intentionally sought to have the witness identify the defendant in court. The state disavowed any such intention. The trial court thereupon denied the defendant's mistrial motion, and ordered that the in-court identification be stricken. The trial court then instructed the jurors to disregard the victim's identification of the defendant and further informed them that the victim had been unable to identify the defendant during a suppression hearing that

[9] The victim, who spoke only Spanish, testified with the assistance of an interpreter at trial and during the suppression hearing.

had been held previously and that, in fact, she had identified two persons other than the defendant as her assailant at that pretrial hearing. The trial court gave the jury the following instruction: "Ladies and Gentleman, the last question asked by the state's attorney to the witness was: Who did you meet? And she made a response which I'm not going to repeat because I don't want to emphasize it because I'm going to ask you to strike that response. I'm going to strike it from the record. I'm asking you to strike it. As I indicated to you before, when the court instructs you, this is a court order, it's not a suggestion. When the court instructs you to strike something, you are to disregard it completely and you are—it's not to enter into your deliberations, you are not to consider it in any way, shape or form, either in your deliberations or in your verdict. And the reason for this is the following: This is a further instruction from me. We had a proceeding in prior days, prior to the beginning of this trial with you. This proceeding was outside the presence of the jury. During this proceeding, the witness . . . the alleged victim, identified two other people in the courtroom and was unable to identify the defendant, Mr. Michael Wooten. You can accept that as a fact, that's an instruction."

Both the state and the defendant objected to the curative instruction. The state argued that the names of the two people to whom the victim had pointed should have been included in the instruction. The defendant, on the other hand, argued that it was impossible for the curative instruction to have eradicated the harm caused by the victim's unanticipated in-court identification of the defendant. The court then asked the jury if it could follow its curative instruction. The jury collectively indicated that it could.

On the following day, the state requested that the trial court rescind its instruction of the previous day.

It argued that the court's instruction had invaded the jury's fact-finding province by telling the jury what it had to find had occurred at the suppression hearing when there was in fact ambiguity as to how and why the misidentifications had occurred. The state proposed that the court give a second curative instruction to supersede the first. It further stated that it wished to reopen its direct examination of the victim and to have her attempt to make another in-court identification before the jury.

The defendant opposed the state's requests, arguing that another curative instruction and the planned in-court identification would confuse the jury and prejudice the defendant. The defendant again moved for a mistrial. The court denied the defendant's motion and gave the following instruction: "Ladies and Gentlemen, yesterday afternoon at or about three o'clock, the State's Attorney was questioning . . . the alleged victim here, and asked the question, I'm sure you recall, 'Who did you meet?' A response was elicited from the alleged victim, and the response was ordered stricken by the court. We excused you; I heard the arguments; you were brought back, and I ordered that the response by [the alleged victim be] stricken by the court, and you weren't to consider it at all. That ruling stands.

"The court further instructed you at a—shortly thereafter as to what transpired at the prior pretrial proceeding, obviously, outside your presence. The part of yesterday's instructions, relevant to what had happened in the pretrial proceeding, is to be likewise stricken and to be disregarded by you. You are to draw no inference from this new instruction today, nor are you to speculate as to what did or did not occur at any pretrial proceeding, nor are you to speculate as to the reasons for any delay in the trial, or draw any inference from the delay.

"In recap, the response of the witness to the question, 'Who did you meet?' remains stricken. And, secondly, the comment by the court as to the circumstances of the pretrial proceeding is to be likewise stricken and to be disregarded by you.

"The jury, as you all know, and [as] I've said to you several times, is the fact finder in these proceedings. And the jury is to find the facts from the credible testimony that is elicited from the witnesses here in the court.

"Is there anyone that feels that they could not follow or does not understand this new instruction today? All right. There's no response."

### A

The defendant first argues that the unanticipated identification of him by the victim before the jury tainted the proceedings and that the court's subsequent curative instructions, rather than ameliorating any harm that might have occurred, simply confused the jury. He claims therefore that he was entitled to have his motion for a mistrial granted. We disagree.

"[A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated." (Internal quotation marks omitted.) *State* v. *Weinberg,* 215 Conn. 231, 250, 575 A.2d 1003, cert. denied, 498 U.S. 967, 111 S. Ct. 430, 112 L. Ed. 2d 413 (1990); *State* v. *Cruz,* 212 Conn. 351, 364, 562 A.2d 1071 (1989); *State* v. *Ubaldi,* 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). "A determination of whether a mistrial is warranted is left to the sound judgment and discretion of the trial judge." *State* v. *Hill,* 201 Conn. 505, 510, 518 A.2d 388 (1986); see *State* v.

*Marra,* 215 Conn. 716, 731–32, 579 A.2d 9 (1990). "If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. *State* v. *Altrui,* 188 Conn. 161, 173, 448 A.2d 837 (1982)." *State* v. *Maldonado,* 193 Conn. 350, 356, 478 A.2d 581 (1984); see Practice Book § 887.[10]

The defendant argues that despite the judiciary's preference for curative instructions, rather than mistrials, the trial court should have granted his motion because the state had reneged on its earlier agreement not to attempt an in-court identification by the victim and the victim had made an identification after having been instructed not to. The defendant claims that as a consequence his defense of misidentification was damaged beyond the ability of any curative instruction to repair it.

Although the victim violated instructions not to identify the defendant before the jury, we do not believe that her impulsive identification required the declaration of a mistrial. "Due process seeks to assure a defendant a fair trial, not a perfect one." *State* v. *Kurvin,* 186 Conn. 555, 565, 442 A.2d 1327 (1982). If the trial court's instruction to the jury to disregard the victim's impromptu identification of the defendant were followed by the jury, as it presumably was, the identification was excluded from the jury's consideration and the necessity for a mistrial was removed. "[J]urors are presumed to follow the instructions given by the judge." *State* v. *Williams,* 202 Conn. 349, 364, 521 A.2d 150 (1987); *State* v. *Negron,* 221 Conn. 315, 331, 603 A.2d 1138 (1992). Further, the trial judge was apparently satisfied that the identification blurted out by the

---

[10] Practice Book § 887 provides in relevant part: "Upon motion of a defendant, the judicial authority may declare a mistrial at any time during the trial if there occurs during the trial an error or legal defect in the proceedings, or any conduct inside or outside the courtroom which results in substantial and irreparable prejudice to the defendant's case . . . ."

victim did not place the defendant in a position "from which a curative instruction could not extricate him." *State* v. *Hill,* supra, 511.

Moreover, later in the trial the victim was properly allowed to identify the defendant in court in the presence of the jury. See infra. Thus, the disputed identification was merely cumulative and therefore harmless. *State* v. *Rogers,* 199 Conn. 453, 462, 508 A.2d 11 (1986); *State* v. *Randolph,* 190 Conn. 576, 590, 462 A.2d 1011 (1983); *State* v. *Jeustiniano,* 172 Conn. 275, 283, 374 A.2d 209 (1977). Under the circumstances, we conclude that the trial court did not abuse its broad discretion by refusing to declare a mistrial. *State* v. *Hill,* supra, 510–11.

## B

After instructing the jury to disregard the victim's unsolicited in-court identification of the defendant, the court then told the jury that during a pretrial hearing the victim had failed to identify the defendant and had identified two other persons as her assailant and that the jury should accept that as fact. Early the next day, however, the trial court, apparently realizing that it had invaded the jury's province by telling the jury what the jury must find had occurred at the suppression hearing, opted to give a second instruction on that subject. In that instruction, the court told the jury to disregard that portion of its previous instruction that had informed the jury that the victim, at a pretrial hearing, had identified two persons other than the defendant as her assailant.

We fail to see why the trial court's second curative instruction required a mistrial. It merely brought to the jury's attention that the court was of the opinion that it had previously invaded the jury's province when it had informed the jurors of what had occurred at the suppression hearing and had told them that it must

accept the court's version of what had occurred as fact. "[T]he constitutional right of trial by jury includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fair-minded men passed upon by the jury and not by the court." *Camp* v. *Booth,* 160 Conn. 10, 13, 273 A.2d 714 (1970). We cannot say, therefore, that the trial court was incorrect in telling the jury to disregard its previous instruction because there was apparently some ambiguity in what had occurred at the suppression hearing. The court's instruction seems clear enough and the jury gave no indication that it was confused by the instruction. Moreover, even if the jury failed to follow the court's instruction, such a failure would have inured to the defendant's benefit.

Furthermore, the victim was later extensively cross-examined concerning what had occurred at the suppression hearing. It was brought out during her cross-examination that she had misidentified two other persons and had failed to identify the defendant as her assailant. The defendant therefore did not suffer the loss of the evidence of the victim's failure to identify the defendant because of the trial court's withdrawal of its previous instructions telling the jury what it must find had occurred at the suppression hearing. We conclude that the trial court did not abuse its discretion by denying the defendant's motion for a mistrial addressed to its second curative instruction.

### III

The defendant next claims that the trial court improperly permitted the state to reopen its direct examination of the victim in order to allow her to make a planned in-court identification of the defendant. The defendant claims that the trial court abused its discretion in allowing the state to recall the victim in order

to make an in-court identification because any identification made at that point would be manifestly unreliable. We do not agree.

After the trial court had given its second curative instruction, it permitted the state to reopen its direct examination of the victim. During the state's direct examination, in response to a question, the victim identified the defendant as her assailant. The victim explained that she had not previously identified the defendant during the suppression hearing because she had been frightened. She testified that she had been afraid because the defendant had been staring at her and she thought that "he could send someone to kill me if I said it was him." The defendant then cross-examined the victim extensively concerning her previous attempt to identify the defendant at the suppression hearing.[11]

"Generally, an in-court testimonial identification need be excluded, as violative of due process, only when it is tainted by an out-of-court identification procedure which is unnecessarily suggestive and conducive to irreparable misidentification." *State* v. *Smith,* 200 Conn. 465, 469, 512 A.2d 189 (1986). "[W]ithout more, the mere exposure of the accused to a witness in the suggestive setting of a criminal trial does not amount to the sort of impermissible confrontation with which the due process clause is concerned." (Internal quotation marks omitted.) Id., 470. "In such cases, the defendant's protection against the obvious suggestiveness *in any courtroom identification confrontation* is his right to cross-examination . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Reddick,* 224 Conn. 445, 470, 619 A.2d 453 (1993); *State* v. *Tatum,* supra, 731; *State* v. *Smith,* supra.

---

[11] The court admitted portions of the transcript of the suppression hearing relevant to the victim's attempted identification of her assailant.

Generally, under the applicable law concerning the admission of in-court identifications, our prior conclusion that the victim's out-of-court identification of the defendant was constitutional would foreclose the defendant's argument that any subsequent in-court identification was inadmissible. See *State* v. *Smith,* supra, 469. The defendant, however, argues that the present case poses a different problem because an intervening factor that occurred after the out-of-court identification and before the planned in-court identification, tainted the subsequent in-court identification. The defendant specifically claims that the victim's attempt to identify her attacker while he was present in the courtroom during the suppression hearing was an intervening factor that required the suppression of any subsequent in-court identification. We disagree.

The fact that there had been a suppression hearing at which the victim had been unable to identify the defendant did not require the trial court to suppress any future in-court identification. *State* v. *Tatum,* supra, 730–31. Although the victim's unsuccessful attempt at identification may have significantly diluted the strength of her subsequent in-court identification, it did not render it inadmissible but goes to the weight to be ascribed to the victim's subsequent in-court identification. Id., 732. Moreover, the defendant had the right, which he fully exercised, to cross-examine the victim concerning the circumstances of her previous attempt to identify the defendant during the suppression hearing. The right to cross-examine an identifying witness operates as a defendant's protection against the suggestiveness of any in-court identification procedure. *State* v. *Smith,* supra, 470. Having been afforded that right, and having exercised it, the defendant cannot succeed in his claim that the trial court abused its discretion by admitting the victim's identification of the defendant.

## IV

The defendant next claims that the trial court improperly failed to instruct the jury that it could use evidence of the victim's prior inability to identify the defendant as her assailant not only for impeachment purposes but also as substantive evidence. The defendant argues that the victim's prior testimony was admissible for the truth of the facts stated therein because it was made under oath and was subject to cross-examination. He claims, consequently, that it met the criteria for reliability set forth in *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), for admission as substantive evidence. The defendant further claims that because the jury was instructed that the victim's prior inconsistent statements could not be considered for substantive purposes, but only for impeachment purposes, that he is entitled to a new trial. We disagree.

The following facts are relevant to this issue. As previously noted, the victim, during the suppression hearing, had pointed out two men other than the defendant when she was asked to identify the man who had assaulted her. During the state's direct examination of the victim during trial, however, she identified the defendant as her assailant. In the defendant's request to charge, he asked for an instruction that the victim's prior inconsistent statement concerning her erroneous identifications "be considered by you . . . and not only as evidence of conduct inconsistent with her testimony on the stand, but also substantively to prove the truth of the facts contained in that prior statement." The defendant cited *State* v. *Whelan,* supra, as authority for his request. The trial court did not give the requested instruction, but instead told the jury that "evidence of statements made inconsistent with the testimony on the stand is admitted not to prove the truth

of the facts contained in the prior statement but as evidence of conduct inconsistent with her testimony on the stand." At trial, the defendant argued that the trial court's instruction concerning the victim's prior inconsistent statement was not in accord with *Whelan.* The trial court concluded, however, that even though the victim's testimony had been under oath, it did not fit within the parameters of *Whelan* because it had not been adopted by the victim or signed by her and it was "replete with ambiguities and expressions of confusion . . . ."

In *Whelan,* we departed from the common law rule prohibiting the substantive use of prior inconsistent statements and we created an exception to the hearsay rule in order "to admit for substantive purposes prior inconsistent statements given under prescribed circumstances reasonably assuring reliability" when the witness was in court subject to cross-examination. Id., 752. The prescribed circumstances articulated in *Whelan* for the admissibility of prior inconsistent written statements are that the declarant: (1) signs the statement; (2) has personal knowledge of the facts stated; and (3) testifies at trial and is subject to cross-examination. Id., 753. Testimony in court, under oath and subject to cross-examination, possesses the indicia of reliability that written statements admissible under *Whelan* need possess.

We therefore agree with the defendant, and the state conceded at oral argument, that the trial court improperly refused to instruct the jury that the victim's prior testimony at the suppression hearing, which was inconsistent with her testimony at trial, could be considered for the truth of the facts contained in her earlier testimony. The state argues, however, that the admission of the victim's pretrial testimony for impeachment purposes, and not for its substantive worth, was harmless. We agree.

Because the failure to give the requested *Whelan* instruction is an evidentiary claim, the defendant must demonstrate that "it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *Tatum,* supra, 738; *State* v. *Jones,* 205 Conn. 723, 732, 535 A.2d 808 (1988). In some instances the use of a prior inconsistent statement for substantive purposes rather than for impeachment purposes might be critical to a resolution of material issues. Here, however, the importance of giving a *Whelan* instruction, compared to the instruction as given, was minimal. If a *Whelan* charge had been given the only difference wrought would have been that the jury, if it had believed the victim's testimony at the suppression hearing, could have found that one of the persons identified at the suppression hearing actually was her assailant. That implication, however, would have been obvious to the jury had it believed the victim's suppression hearing testimony with or without a *Whelan* instruction. The only relevant issue was whether the victim was credible when she testified at trial that the defendant and not someone else had assaulted her. The jury was guided in resolving that issue by the instruction that was given as well as it would have been by a *Whelan* instruction. In summary, the failure to give a *Whelan* instruction under the circumstances was harmless.

Our conclusion comports with our holding in *State* v. *Tatum,* supra. In *Tatum,* the trial court had instructed the jury that it could consider a witness' prior inconsistent statement for impeachment purposes only. As in the present case, the prior inconsistent statement at issue in *Tatum* was the witness' previous identification of someone other than the defendant as the perpetrator of the crime. The defendant claimed that the trial court had improperly failed to instruct the jury that it could consider certain prior

inconsistent statements made by the witness for substantive purposes under *Whelan*. In *Tatum*, we rejected the defendant's *Whelan* claim after analyzing the possible harm that could have occurred as a result of the trial court having given the instruction that it did rather than a *Whelan* instruction. We concluded that the failure to give a *Whelan* instruction was harmless. In this case, as in *Tatum*, we are unable to conceive of how the jury would have decided differently had the court given the requested *Whelan* instruction rather than the instruction that it in fact gave.

Furthermore, the defendant has never suggested, either at trial or in this court, that either of the two men misidentified by the victim in fact was the victim's assailant. Because the defendant has never sought to cast a shadow of guilt on them, he has not even suggested how the trial court's failure to give a *Whelan* charge prejudiced him.

Finally, in view of the minimal practical effect of the evidentiary error, we cannot say that, but for the trial court's error, it is more probable than not that the verdict would have been different. This case did not turn solely on the victim's identification of the defendant. There was compelling, properly admitted evidence from another witness that identified the defendant as the person who had kidnapped and assaulted the victim. In particular, Jose Hernandez, who was an eyewitness to the attack and who had a good opportunity to view the victim's assailant, testified before the jury that he had identified the defendant immediately after the attack on the victim and that he was certain at trial that the defendant was the victim's assailant. The defendant's claim, that the court's failure to give a *Whelan* instruction requires that the defendant be afforded a new trial, fails.

## V

The defendant next claims that the trial court improperly refused to declare a mistrial, and instead gave a "Chip Smith" instruction, after a juror had communicated to the court subsequent to the jury commencing its deliberations. He argues that the communication between the juror and the trial court, and the subsequent "Chip Smith" instruction, so disturbed the jury's deliberations as to violate his right to a fair trial before an impartial jury. We disagree.

On September 26, 1991, the jury commenced its deliberations. The next day, one of the jurors, Kujuana Woolcock, made known to the court through a clerk that she believed that if deliberations were to continue into the following day, she had a potential problem with work. The trial court therefore recommended in open court that she call the school where she worked to inquire if someone could substitute for her. Later the same day, however, she approached the judge in the hallway near his chambers in an attempt to communicate with him. The judge, however, immediately told her that any communication to the court must be in writing. Woolcock told the judge that she did not believe that the foreperson would honor her request to write out her communication. The judge responded that Woolcock could write out a note herself and give it to the sheriff who would, in turn, deliver it to him.

Woolcock thereafter wrote out a note, which was given to the judge, stating the following: "I, Kujuana Woolcock, have in my mind . . . a big problem because I feel different about things than the others. It seems as if they are trying to change my mind to go along with them. I do not want to, but they are badgering somewhat for me to change my mind. I don't

want to change my mind and feel guilty later. I can vote the way they want, but I will have to live knowing that it was not right."

After the trial court had read Woolcock's note into the record, the defendant moved for a mistrial arguing that the note and the ex parte communication with the court were improper. The court then excused the jury for the weekend. On the following Monday, September 30, the jury did not deliberate because one of its members was ill. On that day, however, the trial court, outside the presence of the jury, heard arguments on the defendant's motion for a mistrial because of the content of the note. The court denied the defendant's motion. It then arranged to have an immediate hearing before Judge Thomas Corrigan concerning the ex parte aspects of the scenario surrounding Woolcock's note. During the hearing, Woolcock testified that her communication with the court did not and would not interfere with her deliberations. Judge Corrigan subsequently determined that although an ex parte communication had occurred, it was harmless beyond a reasonable doubt and was not prejudicial to the defendant.[12]

On the day that the jury returned to court to resume its deliberations, the trial court delivered a "Chip Smith" instruction.[13] The instruction was given by the

[12] The hearing before Judge Corrigan, although it began on the day the jurors were absent from court, was not completed until the day after the jury had reached its verdict.

[13] The trial court gave the following instruction: "It is the duty of each juror to discuss and consider the opinions of the other jurors. Despite that, in the last analysis it is your own individual duty to make up your own mind and to decide this case upon the basis of your own individual judgment and conscience. Although the verdict to which each of you agrees must express his or her own conclusion and not be a mere acquiescence in the conclusion of your fellow jurors; yet in order to bring your six minds to a unanimous result, you should consider the questions you have to decide not only carefully but also with due regard and deference to the opinions of each other.

court because it believed from the length of its deliberations and Woolcock's note that the jury was deadlocked. The defendant objected and took an exception. On the same day that the "Chip Smith" instruction was communicated to the jury, the jury reached a verdict.

The defendant first claims that the trial court improperly denied his motion for a mistrial because Woolcock's note was the result of an ex parte communication between the trial judge and Woolcock that was not sanctioned by Practice Book § 845. He argues therefore that the sanctity of the jury's deliberations had been violated. We disagree.

Section 845 provides: "All communications from the jury to the judicial authority shall be in writing. The judicial authority shall require that a record be kept

In conferring together you ought to pay proper respect to each other's opinion and listen with an open mind to each other's argument.

"If much the larger number of you reach a certain conclusion, a dissenting juror or jurors should consider whether his or her opinion is a reasonable one when the evidence does not lead to a similar opinion in the minds of the other jurors, men and women who are equally honest and equally intelligent, who have heard the same evidence with the same intention with equal desire to arrive at the truth and under the sanction of the oath, of the same oath.

"If a majority of you are for one decision, the minority ought seriously to ask themselves whether in reason they should adhere to their own conclusions when those conclusions are not concurred in by most of those with whom they are associated, and whether it might not be well to distrust the weight or sufficiency of the evidence upon which the minority rely, when that evidence fails to bring the minds of their fellow jurors to the same conclusion that they have reached.

"You must make every reasonable effort to come to a verdict. You must consider—excuse me. Strike that. You must listen to what other jurors say. You must not hesitate to reconsider your own opinion. If few of your other jurors do share your viewpoint, you should carefully examine its soundness. All of you have heard the same evidence and the same explanation of the law. As reasonable people you should ultimately be able to come to the same agreement upon a verdict; on the other hand the verdict must be one which each juror considers just in his or her own mind. A juror cannot desert his or her firm and honest convictions simply in order to reach an agreement which he or she regards as wrong. . . ."

of all communications received by him from a juror or the jury after the jury have been sworn, and he shall not communicate with a juror or the jury on any aspect of the case itself, as distinguished from matters relating to physical comforts and the like, except after notice to all parties and reasonable opportunity for them to be present." We have also stated that "[e]x parte conversations between judge and juror are constitutionally prohibited because the judge's statements may affect the jury's impartiality." *State* v. *McCall,* 187 Conn. 73, 81–82, 444 A.2d 896 (1982). "Even when communication occurs between the judge and a juror after deliberations have begun, however, prejudice must be found to warrant a mistrial. *Aillon* v. *State,* 173 Conn. 334, 338, 377 A.2d 1087 (1977) . . . . In a criminal case the burden is on the state to show that the communication was harmless beyond a reasonable doubt. Id., 339." *State* v. *McCall,* supra, 82.

We conclude from our review of the record that the state demonstrated, and Judge Corrigan properly found, that the ex parte contact between Woolcock and the trial judge was harmless beyond a reasonable doubt. The trial judge upon seeing Woolcock near his chambers, immediately told her that any communication that she wished to address to him must be in writing. Woolcock complied with the court's instructions. We fail to see how the defendant was prejudiced by this exchange. See id. Therefore, insofar as the defendant makes a claim that he was entitled to a mistrial because of the contact and verbal communication between the judge and the juror, it is without merit.

The defendant next argues that the trial court improperly coerced Woolcock's vote by giving the "Chip Smith" instruction even after the content of the note had suggested that she was firm in her position as a minority and that the other jurors were "badgering somewhat" for her to change her mind. The defend-

ant claims that, because there was no communication to the court to indicate that the jury was deadlocked, other than what was conveyed to him by way of Woolcock's note, the "Chip Smith" instruction was, in reality, an attempt to coerce one specific juror, Woolcock, to change her mind, rather than an instruction addressed to an unknown number of minority jurors requesting that they reconsider their positions. Consequently, the defendant argues that the "Chip Smith" instruction violated the defendant's due process rights by being unfairly coercive. We are unpersuaded.

It is settled that a "Chip Smith" charge is an acceptable method of assisting the jury to achieve unanimity. *State* v. *Smith,* 49 Conn. 376 (1881); see *State* v. *O'Neill,* 200 Conn. 268, 283, 511 A.2d 321 (1986); *State* v. *Avcollie,* 188 Conn. 626, 641, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983); *State* v. *Stankowski,* 184 Conn. 121, 147, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981). The purpose of the instruction is "to prevent a hung jury by urging the jurors to attempt to reach agreement. It is a settled part of Connecticut jurisprudence." 5 Connecticut Practice, D. Borden & L. Orland, Connecticut Criminal Jury Instructions (1986) § 4.8, p.137. "Better than any other statement . . . it makes clear the necessity, on the one hand, of unanimity among the jurors in any verdict, and on the other hand the duty of careful consideration by each juror of the views and opinions of each of his fellow jurors . . . ." (Internal quotation marks omitted.) *State* v. *Ralls,* 167 Conn. 408, 424–25, 356 A.2d 147 (1974).

As we noted in *State* v. *Avcollie,* supra, 641, a "Chip Smith" charge, "while encouraging a continued search for unanimity, also stresses that each juror's vote must be 'his [or her] own conclusion and not a mere acquiescence in the conclusions of his [or her] fellows . . . .' "

The trial court, by virtue of Woolcock's note and the length of the jury's deliberations, was aware that the jury was deadlocked or virtually so. Being so aware, the trial court did not have to wait until it was explicitly told by the jury that it was deadlocked, but could employ the approved method to remind the jurors that it was their duty to consider each other's views in order, if possible, to reach a unanimous verdict. *State* v. *Ralls,* supra, 425; *State* v. *Garcia,* 13 Conn. App. 67, 68, 534 A.2d 906 (1987). We know of no authority that holds that, if the trial court is aware that a particular juror constitutes the minority or part of the minority of a deadlocked jury, the trial court is prohibited from giving a "Chip Smith" instruction. See *State* v. *Avcollie,* supra, 641–42; see also *United States* v. *Robinson,* 560 F.2d 507, 517–18 (2d Cir. 1977); *United States* v. *Meyers,* 410 F.2d 693, 697 (2d Cir.), cert. denied, 396 U.S. 835, 90 S. Ct. 93, 24 L. Ed. 2d 86 (1969). The purpose of the instruction is, after all, to break deadlocks. This claim of the defendant is without merit.

## VI

We have reviewed the defendant's final claim, i.e., that the trial court violated the defendant's right to be present and to have the assistance of counsel at every stage of his trial by reinstating, sua sponte, in the absence of the defendant or his attorney, a charge of sexual assault that it had previously dismissed without prejudice after the charge had been mistried. We find this claim to be without merit. See *Kentucky* v. *Stincer,* 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 316 (1987); *Snyder* v. *Massachusetts,* 291 U.S. 97, 105–106, 54 S. Ct. 330, 337, 78 L. Ed. 674 (1934); *State* v. *McNellis,* 15 Conn. App. 416, 431–32, 546 A.2d 292, cert. denied, 209 Conn. 809, 548 A.2d 441 (1988).

The judgment is affirmed.

In this opinion PETERS, C. J., BORDEN and NORCOTT, Js., concurred.

BERDON, J., dissenting. I would reach one and only one issue in this matter—namely, whether the trial court's incorrect instruction that the jury could use the victim's pretrial identification testimony for impeachment purposes but not for substantive purposes was harmless.

The majority concedes that the victim's identification of persons other than the defendant at the pretrial hearing should have been admitted for substantive purposes as well as for impeachment purposes under *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). The majority concludes nonetheless that the instruction was harmless because "the importance of giving a *Whelan* instruction, compared to the instruction as given, was minimal. If a *Whelan* charge had been given, the only difference wrought would have been that the jury, if it had believed the victim's testimony at the suppression hearing, could have found that one of the persons identified at the suppression hearing actually was her assailant. That implication, however, would have been obvious to the jury had it believed the victim's suppression hearing testimony with or without a *Whelan* instruction."

The majority's reasoning eludes me.[1] The identification of the assailant was the principal issue at the trial. Even so, the trial court specifically instructed the jury that it could consider the misidentification only as it related to the victim's credibility. Given that "jurors are presumed to follow the instructions given by the

---

[1] I reject the reasoning in *State* v. *Tatum*, 219 Conn. 721, 595 A.2d 322 (1991), for the reasons stated in this dissent. As the defendant points out, to "accept the state's reasoning regarding the effect of *Tatum* on *Whelan* is to agree that, instead of allowing substantive use of certain reliable statements to assist both the state and the defendant in achieving just verdicts, *Whelan* becomes perverted to a tool for the trial court to guide a jury to the verdict that the court feels is most appropriate."

judge"; *State* v. *Williams,* 202 Conn. 349, 364, 521 A.2d 150 (1987); we must presume that the jury considered the misidentification only in evaluating whether the victim was telling the truth and not as substantive evidence that *someone else committed the crime.* If the jury had been allowed to use the misidentification as substantive evidence, it might have believed that a person other than the defendant was the perpetrator. That goes to the heart of the defendant's defense.

Moreover, if the victim had presented the only identification evidence, I might have been able to accept the majority's conclusion that the instruction was harmless, because then the jury, if it disbelieved the victim, would have acquitted the defendant for lack of identification evidence. In this case, however, another witness, Jose Hernandez, testified that he saw the defendant lying on top of the victim engaged in sexual activity. Thus, even if the jury had disbelieved the victim, it still had identification evidence to support a conviction. It was therefore essential that the defendant be able to contradict Hernandez' testimony by producing substantive evidence that another person committed the crime.

Furthermore, the majority suggests that the instruction was harmless because the defendant never argued "that either of his brothers—the two men misidentified by the victim—in fact was the victim's assailant." This argument simply misses the point. The issue is not whether another person was guilty, but whether the defendant was the person who assaulted the victim.

In *Whelan,* we adopted an exception to the hearsay rule permitting the substantive use of a prior inconsistent written statement, reasoning that "prior inconsistent statements made under circumstances providing a reasonable assurance of reliability should be admitted to advance the truth finding function of the jury."

*State* v. *Borrelli,* 227 Conn. 153, 159, 629 A.2d 1105 (1993). The majority now seems to be saying that there is no significant difference between the use of a prior inconsistent statement for impeachment purposes and for substantive purposes. This conclusion not only undermines the purpose of *Whelan,* but defies logic.

I would reverse the conviction and remand the matter to the trial court for a new trial, including a new pretrial hearing on the motion to suppress identification.

I respectfully dissent.