STATE OF CONNECTICUT *v.* JAMES G.
(SC 16967)

Borden, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued September 24, 2003—officially released April 13, 2004

*Timothy H. Everett,* with whom, on the brief, were *Todd D. Fernow,* and *Trent Haas, David Tycz* and *Jennifer Bourn,* certified legal interns, for the appellant (defendant).

*Mitchell S. Brody,* senior assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Christopher Alexy,* senior assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. A jury found the defendant, James G.,[1] guilty of sexual assault in the first degree in violation of General Statutes (Rev. to 1993) § 53a-70 (a) (2),[2] sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (2),[3] and risk of injury to a child in violation of General Statutes (Rev. to 1999) § 53-21 (2).[4] The trial court rendered judgment in accordance

---

[1] In accordance with General Statutes § 54-86e and this court's policy of protecting the privacy interests of victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained.

[2] General Statutes (Rev. to 1993) § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with a person under thirteen years of age . . . ."

General Statutes § 53a-65 (2) defines "sexual intercourse" as "vaginal intercourse, anal intercourse, fellatio or cunnilingus between persons regardless of sex. Its meaning is limited to persons not married to each other. Penetration, however slight, is sufficient to complete vaginal intercourse, anal intercourse or fellatio and does not require emission of semen. Penetration may be committed by an object manipulated by the actor into the genital or anal opening of the victim's body."

[3] General Statutes § 53a-72a (a) provides in relevant part: "A person is guilty of sexual assault in the third degree when such person . . . (2) engages in sexual intercourse with another person whom the actor knows to be related to him or her within any of the degrees of kindred specified in [General Statutes §] 46b-21. . . ."

A "daughter" falls within the degree of kindred specified in § 46b-21.

[4] General Statutes (Rev. to 1999) § 53-21 provides in relevant part: "Any person who . . . (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of a class C felony."

We note that the defendant committed the act or acts that formed the basis of the charge of risk of injury to a child in 1993 or 1994. In January or February, 2000, when the state filed its initial information in the present case, however, it charged the defendant with a violation of General Statutes (Rev. to 1999) § 53-21, the version of § 53-21 in effect at that time. In charging the defendant under General Statutes (Rev. to 1999) § 53-21 (2), the state specifically relied on language that the legislature had added to § 53-21 in 1995. See Public Acts 1995, No. 95-142, § 1. We address the defendant's challenge to his conviction under General Statutes (Rev. to 1999) § 53-21

with the jury verdict and sentenced the defendant to twenty-three years imprisonment. The defendant appealed,[5] claiming that: (1) the trial court improperly allowed the state to introduce evidence of the defendant's prior misconduct to show a common plan or scheme to abuse young girls sexually; (2) the trial court improperly declined to order the disclosure of confidential school and department of children and families records relating to T, the victim, and K, her older half-sister; (3) he was convicted under a statutory provision not in effect at the time of the alleged offense in violation of the ex post facto and due process clauses of the United States constitution;[6] and (4) the trial court improperly denied the defendant's motions for a mistrial and a new trial that were based on alleged prosecutorial misconduct. We reject the defendant's claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In November, 1999, the defendant's biological daughter, T, lodged a criminal complaint against the defendant alleging that he had sexually molested her between April, 1993, and January, 1994, when she was seven years old. The complaint arose after T informed her mother, through a letter written in November, 1999, that the defendant had sexually abused her.[7] At the time of the defendant's January, 2001 trial, T was fifteen years old.[8]

---

(2) as a violation of the ex post facto and due process clauses of the United States constitution; see U.S. Const., art. I, § 10, cl. 1, and amend. XIV, § 1; in part III of this opinion.

[5] The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[6] U.S. Const., art. I, § 10, cl. 1, and amend. XIV, § 1.

[7] The defendant and T's mother had a romantic relationship on and off for eleven years, beginning in November, 1983.

[8] T was born in April, 1986, and K, T's older half-sister, was born in January, 1980. K and T share the same biological mother.

The defendant's sexual abuse of T began in April, 1993, during an incident in which the defendant entered the bathroom just after T had taken a bath. Although the defendant did not reside with T and T's mother at this time, he slept at their house approximately four nights per week.[9] The defendant took T's towel and proceeded to dry her off and digitally penetrate her vagina for approximately five minutes.

Thereafter, the defendant began entering T's room at approximately midnight several times per week. The defendant would cover T's head with a blanket and either digitally or orally penetrate her vagina. The defendant also would kiss T's cheek and neck. He remained clothed during these incidents except for one time when he did not wear pants.

The defendant threatened T, stating that he would harm T's mother and K if T told anyone about the abuse. During the course of the abuse, from April, 1993, to January, 1994, T did not inform anyone about the defendant's actions.

The defendant's sexual abuse of T ceased in January, 1994, after K reported that the defendant had sexually abused her from 1986 to January, 1994. After K had reported the alleged abuse in 1994, the defendant was arrested and charged with unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a)[10] in connection with his abuse of K. K declined to testify at the defendant's trial on that charge, however. The defendant thereafter entered a plea under the *Alford*[11]

---

[9] Prior to T's birth, T's mother and K had lived with the defendant at his residence, beginning in 1984. Thereafter, in 1988 or 1989, T, K and their mother moved out of the defendant's home and into their own.

[10] General Statutes § 53a-95 provides in relevant part: "(a) A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury. . . ."

[11] *North Carolina* v. *Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

doctrine[12] on November 30, 1994, and received a four year suspended sentence and three years probation. Additional relevant facts will be set forth as required.

## I

The defendant first claims that the trial court abused its discretion in allowing the state to elicit testimony from K regarding the defendant's sexual abuse of her to show a common plan or scheme of sexual abuse. The defendant acknowledges that he is "hard-pressed" to dispute the trial court's determination, under our holding in *State* v. *Kulmac*, 230 Conn. 43, 63, 644 A.2d 887 (1994), that the allegations of sexual abuse by K and T are substantially similar. Relying on *State* v. *Sierra*, 213 Conn. 422, 568 A.2d 448 (1990), however, the defendant urges that the specific acts of abuse against K and T differed in nature and duration so as not to fall within the common plan or scheme exception to the inadmissibility of prior misconduct evidence. See Conn. Code Evid. § 4-5. Moreover, the defendant contends that the trial court abused its discretion in determining that the probative value of K's testimony outweighed its prejudicial effect. We disagree with the defendant's arguments, which we address in turn.

At trial, the state sought to introduce, under the common plan or scheme exception, the testimony of K, who was twenty-one years old at the time of trial, regarding prior sexual abuse. The defendant filed a motion in limine to exclude K's testimony. After arguments from counsel, the trial court concluded, pursuant to *State* v. *Kulmac*, supra, 230 Conn. 43, that K's testimony was relevant and material to proving the defendant's com-

---

[12] A defendant may enter an *Alford* plea in the face of strong evidence of factual guilt without admitting guilt to the charged crime. See *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970) ("[a]n individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime").

mon plan or scheme to abuse young girls sexually, and that the probative value of K's testimony outweighed its prejudicial effect. Accordingly, the trial court denied the defendant's motion in limine and allowed K to testify. The court limited the scope of K's testimony, however, by precluding the state from eliciting testimony regarding "unduly prejudicial" and irrelevant details of the defendant's abuse of K.

At trial, K testified that, from 1986 to January, 1994, the defendant had sexually molested her. K stated that, in the initial stages of the abuse, which commenced when K was between six and seven years old, the defendant would touch her genitals and force her to touch his genitals. K also stated that these incidents occurred between three and four times per week when K's mother would leave the house to run errands.

K testified further that when she was between the age of eight and nine years old, the defendant would force her to sit on his lap, while he was unclothed, and have her move back and forth. K also testified that when she was between nine and ten years old, the defendant began having penile-vaginal intercourse with her against her will three to four times per week. This would occur in various locations inside and outside of the home when the defendant and K were alone together. Additionally, K stated that, on at least one occasion, when she was eleven or twelve years old, the defendant had forced her to perform oral sex on him while in a car in a parking lot.

K testified that she did not tell anyone about the abuse because the defendant had warned her that no one would believe her and that she would be sent to a mental institution. K testified further that she did not report the sexual abuse to authorities until January, 1994, because she feared that the defendant would harm

her, although she previously had informed a friend about the abuse.

## A

We previously have observed that, "[a]s a general rule, evidence of prior misconduct is inadmissible to prove that a defendant is guilty of the crime of which he is accused." (Internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 659–60, 835 A.2d 895 (2003); accord *State* v. *Kulmac*, supra, 230 Conn. 60; see also Conn. Code Evid. § 4-5. We have recognized exceptions to this general rule, however. Evidence of prior misconduct "may be admissible . . . for other purposes, such as to prove knowledge, intent, motive, and common scheme or design . . . ." *State* v. *Nunes*, 260 Conn. 649, 684, 800 A.2d 1160 (2002); see also Conn. Code Evid. § 4-5 (b); *State* v. *Merriam*, supra, 660. Accordingly, we have established a two-pronged test for determining the admissibility of prior misconduct evidence. Such evidence is admissible if: (1) it is relevant and material to at least one of the circumstances encompassed by the exceptions; and (2) its probative value outweighs its prejudicial effect. E.g., *State* v. *Merriam*, supra, 661; *State* v. *Kulmac*, supra, 61. In assessing whether prior misconduct evidence offered under the common plan or scheme exception satisfies the first prong of this test, we have required a determination that "the prior offenses (1) are not too remote in time; (2) are similar to the offense charged; and (3) are committed upon persons similar to the prosecuting witness." (Internal quotation marks omitted.) *State* v. *Merriam*, supra, 662; accord *State* v. *Kulmac*, supra, 62.

We note that, in sexual abuse cases, we have construed liberally the standard for admitting prior misconduct evidence to demonstrate a common plan or scheme. E.g., *State* v. *Merriam*, supra, 264 Conn. 662; *State* v. *Kulmac*, supra, 203 Conn. 62. Moreover, we

have emphasized that "[t]he primary responsibility for making these determinations rests with the trial court"; *State* v. *Kulmac*, supra, 61; and, therefore, "[w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." Id. With these principles in mind, we turn to the relevant case law.

In cases with analogous factual underpinnings to those in the present case, we have upheld the admission of testimony by victims of prior sexual abuse as evidence of a common plan or scheme. E.g., *State* v. *Merriam*, supra, 264 Conn. 664; *State* v. *Kulmac*, supra, 230 Conn. 63. In *Merriam*, the defendant, Robert Merriam, appealed his conviction for first degree and second degree sexual assault and risk of injury to a child in connection with his sexual abuse of the victim, the three and one-half year old daughter of Merriam's girlfriend. See *State* v. *Merriam*, supra, 621–24. On appeal, Merriam challenged the trial court's decision to allow the state to elicit, under the common plan or scheme exception, testimony from Merriam's biological daughter that Merriam previously had sexually abused her.[13] Id., 661.

Addressing the first prong of our two part test, we observed that Merriam's sexual abuse of the victim and his sexual abuse of his biological daughter occurred within close proximity of time, separated only by an eight to nine month period. Id., 662. We also noted the similarities characterizing the abuse, the circumstances surrounding the abuse and the victims themselves. Id., 662–63. We stated that "there [were] many similarities between [Merriam's] alleged abuse of his daughter and his abuse of the victim. In each case, [Merriam]: (1)

---

[13] Merriam also challenged the state's introduction of this evidence to establish his identity as the perpetrator of the sexual abuse that formed the basis of the crimes with which he was charged. *State* v. *Merriam*, supra, 264 Conn. 665.

sexually abused a young girl; (2) had a close relationship with the girl's mother, but was not married to her; (3) had access to the victim of the abuse because of his familial or familial-type relationship with her; (4) had ample opportunity to be alone with each victim; and (5) engaged in assaultive behavior consisting of digital or penile penetration of the vagina." Id. Moreover, although we recognized the five year age difference, at the time of the abuse, between the prosecuting victim and Merriam's daughter, we observed that "both were young, prepubescent girls, and [that Merriam] occupied a paternal role in their lives." Id., 663. Accordingly, we held, "[i]n light of [the] similarities between the charged and [the prior] misconduct, and giving appropriate deference to the ruling of the trial court . . . that the trial court did not abuse its discretion in determining that the testimony of [Merriam's] daughter was probative of a common plan or scheme of behavior toward young girls." Id.

We reached a similar conclusion in *State* v. *Kulmac*, supra, 230 Conn. 43. In *Kulmac*, the defendant, Steven B. Kulmac, appealed his conviction of numerous sexual offenses in connection with his sexual abuse of two minor sisters, K and C, whom Kulmac knew through his close friendship with the victims' father. Id., 45–50. The abuse commenced when K was nine years old and when C was eleven years old, and continued concurrently for a two year period. Id., 50.

On appeal, Kulmac claimed that the trial court abused its discretion in allowing the state to elicit the testimony of S, another one of Kulmac's sexual abuse victims. Id., 59–60. S testified that Kulmac had sexually abused her approximately seven years prior to the commencement of his sexual abuse of K and C. Id., 60. Like K and C, S had close family ties to Kulmac at the time of the abuse as she was Kulmac's sister-in-law. See id. The sexual abuse of S, like that of C, began when S was

eleven years old. Id. In addition, Kulmac's sexual abuse of S occurred when Kulmac lived in close proximity to S, that is, in an apartment with S's sister above S's family residence. Id. Moreover, the early acts of Kulmac's sexual abuse of S resembled those against K and C. Id., 63. Under these facts, we held that "the trial court did not abuse its discretion when it found that the misconduct described by S was probative of a common scheme of behavior toward young girls." Id.

In the present case, the defendant's acts of abuse against K and T were not too remote in time. We have held that as much as a seven year lapse between the abuse of a prior victim and the subsequent commencement of abuse of the prosecuting victim is "sufficiently recent to have probative value." Id., 62; see also *State* v. *Merriam*, supra, 264 Conn. 662 (holding that eight to nine month lapse between acts of sexual abuse was not too remote in time); *State* v. *Esposito*, 192 Conn. 166, 170, 471 A.2d 949 (1984) (holding that five week break between two sex crimes was not too remote). In the present case, the abuse of K and T actually overlapped for the entire period of T's abuse, between April, 1993, and January, 1994, and, thus, cannot be deemed too remote in time.

Moreover, the defendant's sexual abuse of K was "similar to the offense charged . . . ." *State* v. *Kulmac*, supra, 230 Conn. 62. Specifically, the defendant began abusing K and T through vaginal touching and would engage in the abusive behavior several times per week.

Finally, the defendant's sexual abuse of K was "committed upon [a person] similar to the prosecuting witness." Id. In particular, the defendant's abuse of K began when she was between six and seven years old and his abuse of T began when she was seven years old. In addition, as in *Merriam* and *Kulmac*, both K and T had close relationships with the defendant, which provided

the defendant with easy access to them and frequent opportunities to be alone with them. Accordingly, we conclude that the trial court did not abuse its discretion in determining that the prior sexual abuse of K was sufficiently similar to that of T so as to satisfy the first prong of our two-pronged test for the admissibility of prior misconduct evidence under the common plan or scheme exception.[14]

The defendant attempts to distinguish the abuse of K and T by highlighting the lengthy duration of the defendant's abuse of K, which spanned eight years, and the comparatively short duration of his abuse of T for less than one year. We are unpersuaded by this argument in light of the fact that the defendant's sexual abuse of T and K ceased upon K's reporting of the defendant's abuse in January, 1994. After K reported the abuse, the defendant was afforded only supervised visitation with T, always occurring in public places, thereby preventing any opportunity for continued sexual abuse. Contrary to the claim of the defendant, the fact that K and T suffered sexual abuse for different lengths of time does not illustrate a behavioral distinction of any significance. We therefore reject this argument.

### B.

With respect to the second prong of our test, the defendant contends that the trial court abused its discretion in concluding that the prejudicial effect of the

---

[14] The defendant relies on *State* v. *Sierra*, supra, 213 Conn. 422, to support his proposition that "[a]n assertion of 'signature-like' similarity between [the abuse of T and K] does not withstand scrutiny." *Sierra* is inapposite to the facts of the present case, however, as the prior misconduct evidence at issue in *Sierra* was offered to prove identity and to impeach the credibility of a codefendant's testimony, not to prove a common plan or scheme. Id., 428. The defendant's reliance on *State* v. *Figueroa*, 235 Conn. 145, 164–65, 665 A.2d 63 (1995), likewise is misplaced as the prior misconduct evidence at issue in that case was offered to prove identity. Id., 161.

evidence of prior sexual abuse did not outweigh its probative value. The defendant specifically contends that the trial court did not adequately recognize the extreme prejudice that K's testimony would yield and "the actual degree to which [K's testimony] would be likely to inflame and arouse the passions of the jury . . . ." The defendant also maintains that the admission of K's testimony effectively transformed the case into "a trial within a trial" and forced the defendant "to defend against both sets of charges and the substantially more serious allegations [of K] . . . ." We do not agree.

We previously have held that the process of balancing probative value and prejudicial effect "is critical to the determination of whether other crime[s] evidence is admissible." (Internal quotation marks omitted.) *State* v. *Nunes*, supra, 260 Conn. 689, quoting *State* v. *Sierra*, supra, 213 Conn. 436. At the same time, however, we have maintained that "[w]e do not . . . requir[e] a trial court to use some talismanic phraseology in order to satisfy this balancing process. Rather . . . in order for this test to be satisfied, a reviewing court must be able to infer from the entire record that the trial court *considered* the prejudicial effect of the evidence against its probative nature before making a ruling." (Emphasis added.) *State* v. *Nunes*, supra, 689–90. When the trial court has "heard a lengthy offer of proof and arguments of counsel before performing the required balancing test," has "specifically found that the evidence was highly probative and material, and that its probative value significantly outweighed the prejudicial effect," and has "instructed the jury on the limited use of the evidence in order to safeguard against misuse and to minimize the prejudicial impact"; *State* v. *Kulmac*, supra, 230 Conn. 63; we have found no abuse of discretion under the second prong. E.g., *State* v. *Merriam*, supra, 264 Conn. 664; *State* v. *Kulmac*, supra, 63.

We note that "[t]he primary responsibility for conducting the balancing test to determine whether the evidence is more probative than prejudicial rests with the trial court, and its conclusion will be disturbed only for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Merriam,* supra, 264 Conn. 664, quoting *State* v. *George B.*, 258 Conn. 779, 793, 785 A.2d 573 (2001). "[Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and [whether it] reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) *State* v. *Vega,* 259 Conn. 374, 392, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002).

In the present case, the record reflects that the trial court considered the probative value of K's testimony and its prejudicial effect. Contrary to the defendant's contention, the trial court engaged in a thorough evaluation of this issue by acknowledging its responsibility to weigh the probative value and prejudicial effect of the evidence and in explaining why it determined, on the basis of our holding in *Kulmac,* that the evidence was more probative than prejudicial. The trial court's concern about the "unduly prejudicial" nature of some graphic details of the proffered testimony also prompted it to "sanit[ize]" and restrict the scope of K's testimony.[15]

---

[15] The trial court explained: "First of all . . . nothing in *Kulmac* or any of the other cases make[s] the court's decision automatic. It is a question of balancing probative value and prejudicial value in the context of each particular situation. Here we have, I believe, overwhelming similarities between this alleged victim's testimony and the testimony we've heard from [K]. [The state's attorney] has already recited those similarities: both within the same time frame; two young girls relatively the same age at the time the sexual assaults began; these were not random selections; in the same household; one victim is alleged to be his daughter; the other [is] the [half]-sister of his daughter; same mother; same access; same modus operandi in both of these cases. I think all of those things clearly present some very probative value of a common scheme or design which would outweigh any sort of prejudice which might otherwise attach to this evidence.

Moreover, both immediately prior to K's testimony and in its final charge, the trial court instructed the jury regarding the limited purpose for which it could consider K's testimony.[16] We have held that "[s]uch limiting instructions serve to minimize any prejudicial

* * *

"I am concerned . . . about the extent of [K's] testimony, and I am going to provide some sanitation of that testimony . . . . With respect to [K's] testimony that there were pictures taken of her, that she was shown pornographic videos, and that the defendant suggested that she be introduced to his friends, those three items are excluded. They serve really no purpose . . . in this case, and those three things are unduly prejudicial and I will not allow mention of those through evidence from any source."

[16] Immediately prior to K's testimony, the trial court instructed the jury in relevant part: "[Y]ou are going to hear some testimony from . . . [K] concerning evidence of misconduct of the defendant with this witness. . . . [T]his testimony will be admitted for a very limited purpose, that is, on the issue of common scheme or plan. You are expressly prohibited from using the evidence you are about to hear as evidence of bad character of the defendant or as evidence of a tendency to commit criminal acts. . . . If you find [this evidence] credible, you may consider it for the sole and limited purpose of assisting you in determining whether or not a common scheme or plan in the commission of criminal acts existed and for no other purpose. And you cannot consider this evidence, as I said, for any other purpose. And as to the purpose for which I am allowing it, you must weigh it and consider it just like any other evidence in the case."

During its final charge, the court again instructed the jury on the limited purpose for which it could consider K's testimony: "I have instructed you that you cannot use [the evidence of prior sexual abuse] as evidence of bad character, or of a criminal disposition, or as evidence of guilt in this case. . . . There is a very narrow exception under our law which allows evidence of prior misconduct of a defendant to be considered by you to the extent, if at all, you find such evidence shows a common scheme or design. . . . [D]uring the presentation of the evidence in this case, you heard testimony of allegations of various acts of misconduct of the defendant relating to [K]. In this case, the [defendant] has not been charged with any crimes relating to [K] and you cannot find him guilty based on these allegations. To find the [defendant] guilty, you must find proven that he committed the crimes alleged in the information all relating to [T]. Thus, if you find that the [defendant] committed acts against [K] but did not commit acts against [T], you must find [him] not guilty. You will recall that the evidence of prior misconduct of the defendant with [K] was admitted for a limited purpose . . . that was on the issue of common scheme or plan. You are expressly prohibited from using this evidence as evidence of bad character of the defendant or as evidence of a tendency to commit criminal acts. If you find

effect that such evidence otherwise may have had"; *State* v. *O'Neil*, 261 Conn. 49, 82, 801 A.2d 730 (2002); see also *State* v. *Sandoval*, 263 Conn. 524, 545–46, 821 A.2d 247 (2003) ("any possible prejudice could have been minimized or even eliminated by an instruction cautioning the jury about the limited purpose of the evidence"); and, "[i]n the absence of evidence to the contrary, we presume that the jury properly followed those instructions." *State* v. *O'Neil*, supra, 82. The trial court, therefore, properly considered the probative value and prejudicial nature of K's testimony.

With respect to the defendant's claim that the trial court did not adequately identify "the actual degree to which [K's testimony] would be likely to inflame and arouse the passions of the jury," we recognize that "[t]here are situations [in which] the potential prejudicial effect of relevant evidence would suggest its exclusion." (Internal quotation marks omitted.) *State* v. *Pappas*, 256 Conn. 854, 888, 776 A.2d 1091 (2001), quoting *State* v. *DeMatteo*, 186 Conn. 696, 702, 443 A.2d 915 (1982). "These are: (1) where the facts offered may *unduly* arouse the jur[ors'] emotions, hostility or sympathy, (2) where the proof and answering evidence it provokes may create a side issue that will *unduly* distract the jury from the main issues, (3) where the evidence offered and the counterproof will consume an *undue* amount of time, and (4) where the defendant, having no reasonable ground to anticipate the evidence, is *unfairly* surprised and unprepared to meet it." (Emphasis added; internal quotation marks omitted.) *State* v. *Ferguson*, 260 Conn. 339, 359–60, 796 A.2d 1118 (2002), quoting *State* v. *DeMatteo*, supra, 702–703. We

this evidence credible, you may consider it for the sole and limited purpose of assisting you in determining whether or not a common scheme or plan for the commission of criminal acts existed, and for no other purpose. . . . You are not permitted to consider this evidence for any other purpose, and, as to that purpose, you must weigh such evidence as you do all other evidence in the case."

note that "[a]ll adverse evidence is [by definition] damaging to one's case, but [such evidence] is inadmissible *only if* it creates *undue* prejudice so that it threatens an injustice were it to be admitted." (Emphasis altered; internal quotation marks omitted.) *State* v. *Sandoval,* supra, 263 Conn. 544, quoting *State* v. *Copas,* 252 Conn. 318, 329–30, 746 A.2d 761 (2000); see also *State* v. *Robertson,* 254 Conn. 739, 758, 760 A.2d 82 (2000) ("Although the tapes were prejudicial, all incriminating evidence is prejudicial. The question, rather, is whether the prejudice was unfair."). Such undue prejudice "is not measured by the significance of the evidence which is relevant but by the impact of that which is *extraneous.*" (Emphasis added.) *State* v. *DeMatteo,* supra, 703; see also *State* v. *Cator,* 256 Conn. 785, 799, 781 A.2d 285 (2001). Thus, evidence is excluded as unduly prejudicial "when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." (Internal quotation marks omitted.) *State* v. *Baldwin,* 224 Conn. 347, 357, 618 A.2d 513 (1993), quoting *United States* v. *Figueroa,* 618 F.2d 934, 943 (2d Cir. 1980); accord Conn. Code Evid. § 4-3, commentary.

The record reveals that the state's attorney asked focused and directed questions of K pertaining to the basics of what type of abuse had occurred, and when and where the abuse had taken place. In addition, the state's attorney did not delve into gratuitous detail about the nature of the defendant's sexual abuse of K but, instead, confined his examination to relatively clinical questions such as: "[D]id [the defendant] ever touch you?" "How often would that go on?" "Would it happen in any particular room in the house?" "[W]as there . . . penile-vaginal intercourse . . . going on?" "[W]hen you were around eleven [or] twelve, is that when the oral sex occurred?"

We also note that when the state's attorney called K as a rebuttal witness, he made no reference to the specifics of the defendant's abuse of her. Instead, the state's attorney made benign references to K's "allegations," her "disclosures" and "what the defendant had done." Furthermore, the state's attorney did not stray from these inquiries into areas that would have been extraneous to the purpose for which K's testimony was offered, namely, proof of a common plan or scheme to abuse young girls sexually. See, e.g., *State* v. *Cator*, supra, 256 Conn. 799; *State* v. *Baldwin*, supra, 224 Conn. 357.

Moreover, we note that evidence, such as K's testimony of sexual abuse, is less likely to "unduly arouse the jur[ors'] emotions, hostility or sympathy"; (internal quotation marks omitted) *State* v. *Ferguson*, supra, 260 Conn. 359; when similar evidence, such as T's testimony of sexual abuse, already has been presented to the jury. See, e.g., *State* v. *Baldwin*, supra, 224 Conn. 358 ("by the time the misconduct evidence was offered, the jury had already heard evidence about the two sales [of narcotics] . . . and, therefore, it is not likely that the jury was swayed, shocked or inflamed any further by the evidence [regarding other misconduct involving the defendant's sale of narcotics]"); see also *State* v. *Sandoval*, supra, 263 Conn. 545 (noting that "[i]t is unlikely that the proffered evidence . . . would have improperly arouse[d] the emotions of the jur[ors] . . . in light of the victim's previous testimony" [citation omitted; internal quotation marks omitted]); *State* v. *Dehaney*, 261 Conn. 336, 358, 803 A.2d 267 (2002) ("[i]n light of the other evidence of the defendant's violent and emotional nature, the victim's statement, 'I fear for the safety of the lives of me [and] my children,' cannot reasonably be characterized as unfairly prejudicial"), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003).

With respect to the defendant's contention that he had to defend against the "more serious allegations" of his sexual abuse of K, we recognize that the testimony of K, like that of T, undoubtedly had an impact on the jury; such is the nature of testimony disclosing facts of child sexual abuse. As we previously have observed, however, although "evidence may have had a significant impact on the jury, that alone is not undue prejudice." *State* v. *Pappas*, supra, 256 Conn. 890. Furthermore, we observe that the disturbing nature of the uncharged misconduct evidence that the trial court permitted the state to elicit is largely due to the fact that the conduct was similar to the charged misconduct. In this regard, we note that part of the defendant's common scheme was precisely that he was engaging in more serious sexual misconduct with K because she was older than T, and, therefore, the defendant could have been viewed as grooming T for a later role similar to that of K. In other words, if the evidence of prior sexual abuse is offered to establish a common scheme or plan and the charged misconduct involves the repeated sexual abuse of a young child, one would expect the prior uncharged misconduct to be disturbing as well. This does not render such evidence *unduly* prejudicial, however. We therefore conclude that the evidence of the defendant's sexual abuse of K, which the trial court carefully limited, was not unduly prejudicial.

Finally, contrary to the defendant's contention that the admission of K's testimony resulted in a "trial within a trial," we note that the state's attorney's entire direct and rebuttal examination of K consisted of only twenty-five pages out of approximately 500 pages of trial transcript. Moreover, as we noted previously, the state's attorney did not belabor his examination of K.[17] We

[17] In addition, we note that the defendant elected to call two defense witnesses, Norman DeNicola and Robin DeNicola, who challenged K's version of events. This testimony undoubtedly drew further attention to K's allegations.

therefore conclude that the trial court did not abuse its discretion in determining that the probative value of K's testimony regarding the defendant's prior sexual abuse outweighed its prejudicial effect.

## II

The defendant next contends that the trial court abused its discretion in precluding the disclosure of confidential school records and files of the department of children and families (department) relating to T and K in violation of his due process rights guaranteed by the United States and Connecticut constitutions. We do not agree.

At trial, defense counsel subpoenaed confidential school attendance, academic and health records and department records relating to T and K, which the trial court reviewed in camera. The trial court thereafter denied the defendant access to the records, stating that it had "look[ed] for either any kind of *Brady*[18] material, impeachment material or any material that would be relevant to the testimonial capacity of [T]." The court stated further that it had "found nothing in any of [the] reports which even arguably approaches any of those areas," and concluded that "nothing in them . . . would be disclosable . . . ." Thereafter, the trial court ordered the records sealed and made them part of the record.

On appeal, the defendant asks that we review these confidential records to determine whether the information disclosed therein contains material subject to disclosure under *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Specifically, the defendant seeks to uncover information that would explain "why, in the midst of examining [K's] allegations in 1994, [the department] did not suspect any sexual

---

[18] *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

abuse of [T] or otherwise seek custodial intervention pursuant to [its] statutory mandate [which] would be enormously exculpatory." Moreover, the defendant seeks to obtain "specific information relating to the circumstances under which [T] expressly denied to investigators that she . . . had been subject to abuse for the preceding nine months . . . [which] would be obviously exculpatory as well."

With respect to a trial court's consideration of whether to allow a defendant access to requested confidential materials, we have held that, upon a proper showing and after an in camera review, "[a]ccess to confidential records should be left to the discretion of the trial court which is better able to assess the probative value of such evidence as it relates to the particular case before it . . . and to weigh that value against the interest in confidentiality of the records." (Internal quotation marks omitted.) *State* v. *Delgado*, 261 Conn. 708, 718, 805 A.2d 705 (2002), quoting *State* v. *Slimskey*, 257 Conn. 842, 856, 779 A.2d 723 (2001). When a defendant seeks access to confidential records for impeachment purposes, the trial court must determine "whether [the records] sufficiently disclose material especially probative of the [witness'] ability to comprehend, know, and correctly relate the truth . . . ." (Internal quotation marks omitted.) *State* v. *Delgado*, supra, 718. Moreover, we have held that "[t]he determination of materiality . . . [is] inevitably fact-bound and like other factual issues is committed to the trial court in the first instance." (Internal quotation marks omitted.) *State* v. *Correa*, 241 Conn. 322, 361, 696 A.2d 944 (1997), quoting *State* v. *Pollitt*, 205 Conn. 132, 147, 531 A.2d 125 (1987).

After a careful review of the records at issue, we conclude that they do not contain exculpatory or impeachment evidence or evidence relating to T's ability "to comprehend, know or correctly relate the truth . . . ." (Internal quotation marks omitted.) *State* v. *Del-*

*gado*, supra, 261 Conn. 718. Accordingly, we conclude that the trial court did not abuse its discretion in denying the defendant access to the records.

## III

The defendant next challenges his conviction of risk of injury to a child under General Statutes (Rev. to 1999) § 53-21 (2) as violative of the ex post facto and due process clauses of the United States constitution. See U.S. Const., art. I, § 10, cl. 1, and amend. XIV, § 1. The defendant argues that those constitutional provisions bar his conviction under General Statutes (Rev. to 1999) § 53-21 (2) because the conduct that forms the basis of that conviction occurred in 1993 and 1994. The defendant also contends that the trial court improperly instructed the jury when it used the definitions of "sexual contact" and "intimate parts," which are not referred to in the version of § 53-21 that was in effect in 1993 and 1994, namely General Statutes (Rev. to 1993) § 53-21. Because the defendant failed to raise these claims at trial, he seeks to prevail under either *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine. See Practice Book § 60-5.

A defendant who fails to preserve a claim at trial nevertheless "may prevail on an unpreserved claim under *Golding* or the plain error doctrine." *State* v. *Ramos*, 261 Conn. 156, 171, 801 A.2d 788 (2002). Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial *only* if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable

doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis added.) *State* v. *Golding*, supra, 213 Conn. 239–40.

Because an adequate record exists and because the claimed violations of ex post facto and due process principles are of constitutional magnitude; see, e.g., *Lynce* v. *Mathis*, 519 U.S. 433, 440 n.12, 117 S. Ct. 891, 137 L. Ed. 2d 63 (1997); the defendant's claims satisfy the first two prongs of *Golding* and, therefore, are reviewable. The defendant's claims fail under the third prong, however, because he has not demonstrated that the alleged constitutional violations clearly exist and that he was deprived of a fair trial. We will address each of the defendant's contentions in turn.

The following additional facts are necessary to our resolution of the defendant's claims. In 1993 and 1994, the time period of the defendant's abuse of T, the version of § 53-21 that was in effect provided: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both." General Statutes (Rev. to 1993) § 53-21.

In its initial information, which was filed in January or February, 2000,[19] the state charged the defendant with, inter alia, risk of injury to a child under the version of § 53-21 in effect at that time, namely, General Statutes (Rev. to 1999) § 53-21. General Statutes (Rev. to 1999)

---

[19] We note that the state filed multiple substitute informations in this case, the last of which was filed on January 25, 2001. In the final substitute information, the state charged the defendant with risk of injury to a child under the same provision under which it had charged him in the original information, namely, General Statutes (Rev. to 1999) § 53-21 (2).

§ 53-21 provides in relevant part: "Any person who: (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child, or (2) *has contact with the intimate parts, as defined in [General Statutes §] 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child* . . . shall be guilty of a class C felony." (Emphasis added.) The division of § 53-21 into two subdivisions and the addition of the language found in subdivision (2) occurred in 1995 with the passage of Public Acts 1995, No. 95-142, § 1 (P.A. 95-142).[20]

The defendant was found guilty of risk of injury to a child under General Statutes (Rev. to 1999) § 53-21 (2) and sentenced to ten years imprisonment with respect to that offense, the maximum allowable term of imprisonment under the pre-1995 amendment and post-1995 amendment versions of § 53-21.[21]

## A

The defendant claims that, because the acts that formed the basis of the risk of injury charge and that

---

[20] We note that § 53-21 subsequently was amended in 1997 to add a third subdivision. See Public Acts 1997, No. 97-147, § 1. Although this amendment was incorporated in General Statutes (Rev. to 1999) § 53-21, it has no bearing on the issues raised in this appeal.

[21] The trial court ordered this ten year sentence to run concurrently with the other sentences imposed in connection with the defendant's conviction of sexual assault in the first degree and sexual assault in the third degree. The trial court imposed consecutive terms of nineteen years imprisonment for the defendant's conviction of sexual assault in the first degree and four years imprisonment for his conviction of sexual assault in the third degree.

were alleged in the state's information occurred in 1993 and 1994, the state should have charged him under the risk of injury statute in effect at that time, namely, General Statutes (Rev. to 1993) § 53-21. The defendant contends that, because the state charged him under the 1999 version of the statute, his conviction of risk of injury to a child must be reversed as violative of ex post facto and due process principles. We disagree.

The constitution of the United States, article one, § 10, provides in relevant part: "No State shall . . . pass any . . . ex post facto Law . . . ." U.S. Const., art. I, § 10, cl. 1. Pursuant to this directive, the United States Supreme Court has held that states may not "enact any law which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." (Internal quotation marks omitted.) *Weaver* v. *Graham*, 450 U.S. 24, 28, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981), quoting *Cummings* v. *Missouri*, 71 U.S. (4 Wall.) 277, 325–26, 18 L. Ed. 356 (1867); accord *State* v. *Kelly*, 256 Conn. 23, 88, 770 A.2d 908 (2001). Thus, "[t]o fall within the ex post facto prohibition, a law must be retrospective—that is, it must apply to events occurring before its enactment—*and* it must disadvantage the offender affected by it . . . by altering the definition of criminal conduct or increasing the punishment for the crime . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) *Lynce* v. *Mathis*, supra, 519 U.S. 441, quoting *Weaver* v. *Graham*, supra, 29; see also *State* v. *Parra*, 251 Conn. 617, 626 n.7, 741 A.2d 902 (1999). When "the change has had no effect on the defendant in the proceedings of which he complains"; *Dobbert* v. *Florida*, 432 U.S. 282, 300, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977); however, he "may not complain of burdens" that do not attach to the sentence he has received. Id., 301.

We previously have construed the version of § 53-21 in effect at the time of the defendant's abuse of T "to proscribe two general types of behavior likely to injure physically or to impair the morals of a minor under sixteen years of age: (1) deliberate indifference to, acquiescence in, or the creation of situations inimical to the minor's moral or physical welfare . . . and (2) acts directly perpetrated on the person of the minor and injurious to his [or her] moral or physical well-being." (Internal quotation marks omitted.) *State* v. *James*, 211 Conn. 555, 582, 560 A.2d 426 (1989); accord *State* v. *Pickering*, 180 Conn. 54, 64, 428 A.2d 322 (1980); see also *State* v. *Dinoto*, 32 Conn. App. 217, 222, 628 A.2d 618, rev'd in part on other grounds, 229 Conn. 580, 642 A.2d 717 (1994). On the basis of the latter proscription, we have held that "[t]his court's opinions . . . make it clear that the deliberate touching of the private parts of a child under the age of sixteen in a sexual and indecent manner is violative of that [version of § 53-21 that was in effect at the time of the defendant's abuse of T]." *State* v. *Pickering*, supra, 64; accord *State* v. *Zwirn*, 210 Conn. 582, 588, 556 A.2d 588 (1989); *State* v. *Schriver*, 207 Conn. 456, 463, 542 A.2d 686 (1988).

Thus, the post-1995 amendment version of § 53-21, the version of § 53-21 that the defendant had been charged with violating, made express in its terms what we previously had defined, in *Pickering* and its progeny, as conduct constituting risk of injury to a child.[22] The 1995 amendment to § 53-21 divided the risk of injury statute into two subdivisions: Subdivision (1) contains the entire pre-1995 amendment version of the statute except the part designating the maximum sentence and fine that could be imposed for sentencing purposes;[23]

---

[22] The legislature opted, however, to employ the term "intimate parts"; General Statutes (Rev. to 1999) § 53-21; instead of the term "private parts."

[23] We note that P.A. 95-142, § 1, also made technical changes to the pre-1995 amendment version of § 53-21 that appear in subdivision (1) of the post-1995 amendment version of § 53-21. These changes have no bearing on the merits of this appeal.

and subdivision (2) incorporates the prohibition, which previously had been recognized in our case law, against "contact with the intimate parts . . . of a child . . . in a sexual and indecent manner . . . ." P.A. 95-142, § 1.

Accordingly, in light of this court's previous rulings construing the pre-1995 amendment version of § 53-21 as encompassing the deliberate touching of a child's private parts in a sexual and indecent manner, it cannot be said that P.A. 95-142, § 1, although applied retroactively to the defendant's case, effected changes in the law so as to "disadvantage the offender affected by it . . . by altering the definition of criminal conduct . . . [in violation of the ex post facto prohibition]." (Citation omitted; internal quotation marks omitted.) *Lynce* v. *Mathis*, supra, 519 U.S. 441. Whether by judicial construction, as with the pre-1995 amendment version of § 53-21, or by express codification, as with the post-1995 amendment version of § 53-21, the defendant's sexual abuse of T was proscribed under the statute.

We note that P.A. 95-142, § 1, altered the punishment that can be imposed upon conviction of risk of injury to a child from a maximum term of ten years imprisonment[24] to a mandatory minimum of one year imprisonment and a maximum term of ten years imprisonment. Compare General Statutes (Rev. to 1993) § 53-21 with General Statutes (Rev. to 1999) § 53-21 (characterizing risk of injury to child as class C felony, which, according to General Statutes § 53a-35a, subjects defendant so convicted to term of "not less than one year nor more than ten years" imprisonment). Public Act 95-142, § 1, did not affect or disadvantage the defendant, however, because the change did not increase his punishment for the crime.[25] See *Dobbert* v. *Florida*, supra, 432 U.S. 300–301.

[24] The pre-1995 amendment version of § 53-21 also permitted the imposition of up to a $500 fine. See General Statutes (Rev. to 1993) § 53-21.

[25] Although we previously have noted that "[a] statute affecting substantial changes in the law is not to be given a retrospective effect unless it clearly

In *Dobbert*, the petitioner, Ernest John Dobbert, Jr., appealed his death sentence to the United States Supreme Court, claiming, inter alia, that his sentence, having been imposed pursuant to a version of a Florida death penalty statute that was not in effect at the time he had committed the crime, violated the ex post facto prohibition. See id., 284, 297. Dobbert also claimed that an amendment to a Florida statute requiring any person sentenced to life in prison to serve a mandatory minimum of twenty-five years before becoming eligible for parole constituted an ex post facto law.[26] Id., 298. In affirming Dobbert's death sentence, the court observed that Dobbert "did not receive a life sentence, and so any added onus attaching to it as a result of the change in Florida law had no effect on him." Id. Thus, the court held that Dobbert's death sentence could not be overturned on the basis of any new burdens attaching to a life sentence, a sentence that was not imposed in Dobbert's case. Id., 300–301.

In the present case, the change in punishment under the post-1995 amendment version of § 53-21 did nothing to render more onerous the term of imprisonment imposed upon the defendant. The defendant received a ten year sentence, which is the maximum sentence that the defendant could have received under either the pre-1995 amendment version or the post-1995 amendment version of § 53-21.[27] Thus, as in *Dobbert*, because

and unequivocally appears that such was the legislative intent"; (internal quotation marks omitted) *State* v. *Ross*, 230 Conn. 183, 282, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); accord *State* v. *Paradise*, 189 Conn. 346, 351, 456 A.2d 305 (1983); see also *State* v. *Quinet*, 253 Conn. 392, 414, 752 A.2d 490 (2000) ("[w]e will not give retrospective effect to a criminal statute absent a clear legislative expression of such intent"); our determination that P.A. 95-142, § 1, does not amount to a substantial change in the law under the circumstances of this case renders this inquiry unnecessary.

[26] The preamendment version of the Florida statute contained no such requirement. *Dobbert* v. *Florida*, supra, 432 U.S. 298.

[27] We note that, in *Lindsey* v. *Washington*, 301 U.S. 397, 57 S. Ct. 797, 81 L. Ed. 1182 (1937), the United States Supreme Court held that "the ex post

the 1995 amendment to § 53-21 had no effect on the defendant, his ten year sentence does not violate ex post facto clause.

With respect to the defendant's due process claim, we note that due process requires that the state provide fair warning to an accused before "holding [him] criminally responsible for conduct which he could not reasonably understand to be proscribed." (Internal quotation marks omitted.) *Rose* v. *Locke*, 423 U.S. 48, 49, 96 S. Ct. 243, 46 L. Ed. 2d 185 (1975); accord *State* v. *Miranda*, 260 Conn. 93, 102–103, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002). Thus, "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States* v. *Lanier*, 520 U.S. 259, 267, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997); accord *State* v. *Miranda*, supra, 103.

For due process purposes, our case law construing the pre-1995 amendment version of § 53-21 provided the defendant with ample notice that his conduct violated the statute. See, e.g., *State* v. *Zwirn*, supra, 210 Conn. 588; *State* v. *Schriver*, supra, 207 Conn. 463; *State* v. *Pickering*, supra, 180 Conn. 64. The case law, read

facto clause looks to the standard of punishment prescribed by a statute, rather than to the sentence actually imposed. . . . [A]n increase in the possible penalty is *ex post facto* . . . regardless of the length of the sentence actually imposed, since the measure of punishment prescribed by the later statute is more severe than that of the earlier . . . ." (Citations omitted; emphasis in original.) Id., 401. Although, in the present case, the increase in the *minimum* term of imprisonment under P.A. 95-142, § 1, creates a more onerous punishment for certain defendants, the added onus has no practical effect on this defendant, who was sentenced to the maximum ten year term of imprisonment, which is authorized under both versions of § 53-21. See *Dobbert* v. *Florida*, supra, 432 U.S. 300–301. The United States Supreme Court, in *Dobbert*, limited the scope of *Lindsey* to cases in which the defendant is "not complaining in the abstract about some change in the law, which as events [prove], [has] no applicability to [the defendant's] case." Id., 300. Accordingly, *Lindsey* has no relevancy to the present appeal.

in conjunction with the text of the pre-1995 amendment version of § 53-21, "serve[d] to warn a potential violator that the deliberate touching of the private or intimate parts of a child under sixteen in a sexual and indecent manner is prohibited." *State* v. *Perruccio*, 192 Conn. 154, 161, 471 A.2d 632, appeal dismissed, 469 U.S. 801, 105 S. Ct. 55, 83 L. Ed. 2d 6 (1984). Under either version of § 53-21, the defendant's conduct fell squarely within the ambit of conduct proscribed therein. Accordingly, the defendant's due process claim fails.

B

The defendant next claims that the trial court improperly instructed the jury on "borrowed" definitions of "intimate parts" and "sexual contact" contained in § 53a-65[28] but not contained in the version of § 53-21 in effect at the time of the defendant's sexual abuse of T in 1993 and 1994. Moreover, the defendant urges that the trial court improperly provided the jury with a definition of "sexual contact," a term that does not appear in the post-1995 amendment version of § 53-21, under which the defendant was charged. We reject these arguments.

In its final charge to the jury, the trial court instructed the jury on the law relating to risk of injury to a child. The court instructed the jury that, in order for it to convict the defendant of this offense, it would have to

---

[28] General Statutes § 53a-65 provides in relevant part: "As used in this part, except section 53a-70b, the following terms have the following meanings:

\* \* \*

"(3) 'Sexual contact' means any contact with the intimate parts of a person not married to the actor for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person or any contact of the intimate parts of the actor with a person not married to the actor for the purpose of sexual gratification of the actor or for the purpose of degrading or humiliating such person.

\* \* \*

"(8) 'Intimate parts' means the genital area, groin, anus, inner thighs, buttocks or breasts. . . ."

find beyond a reasonable doubt: "One, that the defendant did an act that was likely to impair the health or morals of a child; and two, that at the time of such act the alleged victim was under sixteen years of age; and three, that the defendant had the general intent to perform such act." The court further instructed the jury in relevant part: "To establish that a person committed an act likely to impair the health of a minor, the state must prove beyond a reasonable doubt that the actor committed blatant physical abuse that endangered the child's physical well-being. . . . The act itself must be done in a sexual and indecent manner. . . . It is not the act itself that is likely to impair the morals of the child but the manner in which it is done. Therefore, the inquiry under the first element is whether the actor did any act in a sexual and indecent manner that was likely to impair the morals of the child. Again, however, the actor need . . . only [have] the general intent to perform the sexual and indecent act. . . . As used here, 'morals' means good morals, living, acting, and thinking in accordance with those principles and precepts which are commonly accepted among us as right and decent. The acts alleged here are of sexual contact. Sexual contact means any contact with the intimate parts of a person for the purpose of sexual gratification of the actor, or any contact of the intimate parts of the actor with a person for the purpose of sexual gratification of the actor. . . . The intimate parts as applicable here means the genital area. To constitute sexual contact, there must be an actual touching. There need not, however, be direct contact with the unclothed body of the person or the defendant. It is enough if the touching of the genital area was through the person's clothes or through the defendant's clothing. Furthermore, the touching of the other person's intimate parts or of the defendant's intimate parts must have been for the sexual gratification of the defendant."

Although we acknowledge that the pre-1995 amendment version of § 53-21 did not employ the terms "intimate parts" and "sexual contact," our precedent validates the use of the definitions set forth in § 53a-65 in construing the pre-1995 amendment version of § 53-21. See *State* v. *Perruccio*, supra, 192 Conn. 160. In *Perruccio*, the defendant, Dennis M. Perruccio, challenged, inter alia, his conviction of risk of injury to a child under the same version of the statute under which the defendant in the present case claims that he should have been charged.[29] See id., 156, 158. On appeal, Perruccio argued that the act of touching the victim's breast did not constitute an act likely to impair the morals of a child because a breast did not constitute a private part. See id., 158, 159.

Although we rejected Perruccio's interpretation of § 53-21; id., 159; we did note that the statute failed to specify the types of acts that would fall within its purview. See id., 160. Accordingly, we looked to the definition of "intimate parts" contained in § 53a-65 (8), as directed by General Statutes § 53a-2,[30] for guidance. Id. Specifically, with reference to Perruccio's touching of the victim's breast, we held that it was "clear from § 53a-2 that th[e] . . . definition of 'intimate parts' [set forth in § 53a-65] is to apply not only to the sections of the penal code pertaining to sexual offenses *but to all sections of the general statutes pertaining to such offenses including § 53-21.*" (Emphasis altered.) Id. Applying the definition of "intimate parts" contained in

[29] Perruccio was charged under General Statutes (Rev. to 1979) § 53-21 and General Statutes (Rev. to 1981) § 53-21; see *State* v. *Perruccio*, supra, 192 Conn. 156; both of which are identical to General Statutes (Rev. to 1993) § 53-21.

[30] General Statutes § 53a-2 provides: "The provisions of this title shall apply to any offense defined in this title or the general statutes, unless otherwise expressly provided or unless the context otherwise requires, and committed on or after October 1, 1971, and to any defense to prosecution for such an offense."

§ 53a-65 (8) to Perruccio's actions, we determined that Perruccio had committed an act that was likely to impair the morals of a child, in violation of the statute. Id.

With respect to the present case, *Perruccio* informs us that the pre-1995 amendment version of § 53-21 encompasses the definition of "intimate parts" contained in § 53a-65 (8). See id. Moreover, *Perruccio* instructs that § 53a-2 permits the application of definitions set forth in § 53a-65 to the pre-1995 amendment version of § 53-21. See id. Thus, although the pre-1995 amendment version of the statute did not expressly contain the terms "intimate parts" and "sexual contact," both § 53a-2 and our holding in *Perruccio* support the use of such definitions. See id.

The defendant's claim that the trial court improperly provided the jury with a definition of "sexual contact," a term that does not appear in the post-1995 amendment version of § 53-21, likewise is without merit because the post-1995 amendment version of § 53-21, specifically subdivision (2), refers the reader to the definitions enumerated in § 53a-65, one of which is "sexual contact." General Statutes § 53a-65 (3); see General Statutes (Rev. to 1999) § 53-21 (2) (prohibiting "contact with the intimate parts, *as defined in section 53a-65,* of a child under the age of sixteen years . . . in a sexual and indecent manner" [emphasis added]). Furthermore, although General Statutes (Rev. to 1999) § 53-21 (2) uses the term "contact" as opposed to "sexual contact," the phrase "in a *sexual* and indecent manner" modifies the phrase "contact with the intimate parts," thereby implicating the definition of "sexual contact." (Emphasis added.) Moreover, the improper contact with intimate parts prohibited by § 53-21 (2) cannot qualify as anything other than "sexual" contact. (Emphasis added.) General Statutes (Rev. to 1999) § 53-21 (2). Accordingly, the defendant cannot prevail on his claim

because he has failed to satisfy the third prong of *Golding*.

## C

The defendant also seeks to prevail on the foregoing claims under the plain error doctrine. See Practice Book § 60-5. We reject this claim.

Practice Book § 60-5 provides in relevant part: "The court may reverse or modify the decision of the trial court if it determines . . . that the decision is . . . erroneous in law. . . ." We have emphasized, however, that "[p]lain error review is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Whipper*, 258 Conn. 229, 279–80, 780 A.2d 53 (2001); see also *State* v. *Vega*, 259 Conn. 374, 394, 788 A.2d 1221 (2002) ("plain error is not even implicated unless the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings" [internal quotation marks omitted]), cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2003). Under this rubric, "[a]n important factor in determining whether to invoke the plain error doctrine is whether the claimed error result[ed] in an unreliable verdict or a miscarriage of justice." (Internal quotation marks omitted.) *State* v. *Fitzgerald*, 257 Conn. 106, 111, 777 A.2d 580 (2001).

For the reasons that we explained in part III A and B of this opinion, we conclude that no error that would render the verdict unreliable or that would constitute a miscarriage of justice exists in the present case. We therefore reject the defendant's claim under the plain error doctrine.

## IV

The defendant finally claims that the trial court abused its discretion in denying his motions for a mis-

trial and for a new trial, which were based on allegedly improper comments made by the state's attorney during his cross-examination of the defendant. We disagree.

During cross-examination of the defendant, the state's attorney sought to question him about a conversation that he allegedly had had with T and K's grandmother[31] on January 25, 1994, during which the defendant confessed to having sexually abused K. The court heard arguments from counsel outside of the presence of the jurors regarding the extent to which the state's attorney could question the defendant about the alleged conversation. The trial court ruled that the state's attorney could ask the defendant whether he recalled making the statement to the grandmother,[32] but that, "[i]f he says he didn't make it, then that's the end of the inquiry . . . ."

The state's attorney then resumed his line of questioning and asked the defendant, "Do you recall telling [T and K's grandmother] on the night of January [25], 1994, that you molested [K]?" The defendant replied, "No, I do not."[33] After some tangential questioning regarding the defendant's possession of guns and his

---

[31] T and K's grandmother was deceased at the time of trial.

[32] The trial court also observed the state's attorney's "good faith basis upon which to ask the question," namely, the existence of a notarized statement in which the grandmother attested to the defendant's January 25, 1994 confession that he had sexually abused K.

[33] The entire exchange between the state's attorney and the defendant unfolded as follows:

"Q. Do you recall telling [T and K's grandmother] on the night of January [25], 1994, that you molested [K]?

"A. No, I do not.

"Q. Recall telling her that you needed help?

"A. No, I do not remember any of that.

"Q. I'm sorry?

"A. I [said] no, I did not.

"Q. And what was the last part?

"A. I didn't remember doing it, and I didn't do it. I don't remember speaking with her either."

past romantic relationships, the state's attorney resumed his questioning regarding the alleged conversation between the defendant and T and K's grandmother. The state's attorney asked the defendant, "Do you remember telling [the grandmother] that there [were] so many times you wanted to tell [T and K's mother]," whereupon defense counsel objected. The state's attorney continued, "But you just couldn't?" The defendant answered, "No, I don't," after which the trial court overruled defense counsel's objection.

Subsequently, in the course of questioning the defendant about his 1994 *Alford* plea,[34] the state's attorney asked the defendant, "And you were aware, were you not, sir, that, regardless of whether or not [K] wanted to come to court to testify, was able to come to court to testify, that [T and K's grandmother], who you admitted," whereupon defense counsel immediately objected, after which the state's attorney continued, "the abuse to would," immediately after which the trial court sustained defense counsel's objection. After the trial court sustained the objection, defense counsel moved for a mistrial outside of the presence of the jurors.

After considering arguments from counsel, the trial court denied the defendant's motion for a mistrial. The trial court reasoned that the state's attorney's question was "a fleeting reference on a one time occurrence," and concluded that it was "not sufficient to declare a mistrial because a curative instruction will solve the problem." After the jury returned to the courtroom, but before the state's attorney was allowed to continue his cross-examination of the defendant, the trial court instructed the jury in relevant part: "[I]n the last question asked just before you went out, there was a reference by [the state's attorney] in his question to the defendant concerning his conversation with [T and K's

---

[34] See text accompanying footnotes 11 and 12 of this opinion.

grandmother]. There's no evidence of that. . . . Disregard it." The trial court also highlighted the impropriety by informing the jury that "the [state's attorney's] question in that regard was improper."

We previously have observed that prosecutorial misconduct may occur during the course of cross-examination of witnesses. E.g., *State* v. *Reynolds*, 264 Conn. 1, 164, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). We have emphasized that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor." (Internal quotation marks omitted.) Id., 161; see also *State* v. *Whipper*, supra, 258 Conn. 262. Thus, when confronted with a claim of prosecutorial misconduct, "we must determine whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Burton*, 258 Conn. 153, 165, 778 A.2d 955 (2001); accord *State* v. *Whipper*, supra, 262. The burden of proving a constitutional violation as a result of prosecutorial misconduct rests with the defendant; see, e.g., *State* v. *Brown*, 256 Conn. 291, 298, 772 A.2d 1107, cert. denied, 534 U.S. 1068, 122 S. Ct. 670, 151 L. Ed. 2d 584 (2001); and the defendant "must demonstrate substantial prejudice." (Internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 699, 793 A.2d 226 (2002).

In examining a claim of prosecutorial misconduct, "we must view the prosecutor's comments in the context of the entire trial . . . [and] we must distinguish between those comments whose effects may be removed by appropriate instructions . . . and those which are flagrant and therefore deny the accused a fair trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Brown*, supra, 256 Conn. 298. With respect to curative instructions that are given in

response to an alleged impropriety, we repeatedly have held that "the jury is presumed to follow the court's curative instructions in the absence of some indication to the contrary"; *State* v. *Grenier*, 257 Conn. 797, 810, 778 A.2d 159 (2001); *State* v. *McIntyre*, 250 Conn. 526, 533, 737 A.2d 392 (1999) ("[i]t is to be presumed that the jury followed the court's [curative] instructions unless the contrary appears" [internal quotation marks omitted]); *State* v. *Wooten*, 227 Conn. 677, 694, 631 A.2d 271 (1993) ("[j]urors are presumed to follow the instructions given by the judge" [internal quotation marks omitted]); and we have recognized that "a prompt cautionary instruction to the jury regarding improper prosecutorial remarks or questions can obviate any possible harm to the defendant." (Internal quotation marks omitted.) *State* v. *Satchwell*, 244 Conn. 547, 569, 710 A.2d 1348 (1998); accord *State* v. *Whipper*, supra, 258 Conn. 270; *State* v. *Ubaldi*, 190 Conn. 559, 563, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983).

Moreover, we have afforded deference to trial courts in deciding whether to deny a defendant's motion for a mistrial that is based on prosecutorial misconduct. See, e.g., *State* v. *Copas*, 252 Conn. 318, 340, 746 A.2d 761 (2000). Thus, we have stated that "[t]he [trial] court, as a result of its familiarity with the context in which the prosecutor's remarks were made, [is] in a favorable position to evaluate the nature of [the allegedly improper] remarks. . . . Therefore, its determination that the prosecutor's remarks did not require a mistrial must be afforded great weight." (Internal quotation marks omitted.) Id.; see also *State* v. *Wooten*, supra, 227 Conn. 693 ("[a] determination of whether a mistrial is warranted is left to the sound judgment and discretion of the trial judge" [internal quotation marks omitted]).

If we conclude that a prosecutorial impropriety exists, we must then "determin[e] whether [the impro-

priety] was so serious as to amount to a denial of due process . . . ." (Internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 478, 832 A.2d 626 (2003). Our determination in this regard requires us to consider: "(1) the extent to which the misconduct was invited by defense conduct or argument; (2) the severity of the misconduct; (3) the frequency of the misconduct; (4) the centrality of the misconduct to the critical issues in the case; (5) the strength of the curative measures adopted; and (6) the strength of the state's case." *State* v. *Burton*, supra, 258 Conn. 165.

The defendant contends that the trial court improperly assessed the level of prejudice resulting from the state's attorney's cross-examination of the defendant. Furthermore, the defendant argues that the trial court's curative instruction was inadequate in that it lacked the necessary force to remove from the jurors' minds the taint caused by the state's attorney's improper question. Moreover, the defendant asserts that only a new trial sufficiently will deter such prosecutorial misconduct in the future as the state's attorney in the present case deliberately circumvented the trial court's ruling in asking the improper question. We do not agree with the defendant.

We agree with the trial court's determination that the subsequent questioning of the defendant, during which the state's attorney implied that the defendant had admitted to T and K's grandmother that he had molested K, was improper. Bearing in mind the deference afforded the trial court in its determination to deny a motion for a mistrial, however, we conclude that the trial court's immediate curative instruction, which we presume the jury to have followed in light of the lack of evidence to the contrary, as well as the court's chiding of the state's attorney's question as "improper," sufficiently eliminated any prejudice that could have resulted from the misconduct. In addition, the miscon-

duct occurred only once, and, after the trial court struck the question and issued its curative instruction, the state's attorney did not revisit the issue. Moreover, the jury heard the defendant testify two separate times that he did not recall the conversation, and, in view of the conflicting testimony of the defendant and K, the jury would have been able to assess the credibility of each witness and each witness' account of what had occurred. Accordingly, we conclude that no due process violation arose, and, consequently, the trial court did not abuse its discretion in denying the defendant's motion for a mistrial.[35]

Alternatively, the defendant implores this court to invoke its supervisory authority over the administration of justice to deter what, according to the defendant, amounted to the state's attorney's wilful circumvention of the trial court's ruling.[36] We decline to do so.

We previously have held that we may invoke our inherent supervisory authority in cases in which "prosecutorial misconduct is not so egregious as to implicate the defendant's . . . right to a fair trial . . . [but] when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper."

---

[35] For the same reasons, we conclude that the trial court did not abuse its discretion in denying the defendant's motion for a new trial, which essentially was based on the same premise as the defendant's motion for a mistrial.

[36] Although the defendant also apparently challenged the closing arguments of the state's attorney in his brief, the defendant disclaimed any independent challenge to closing arguments in his reply brief. Rather, the defendant argued in his reply brief that the state's attorney's allegedly improper closing remarks were indicative of intentional misconduct on the part of the state's attorney during his cross-examination of the defendant. We find the defendant's contention unavailing because the state's attorney made no reference to the alleged conversation between the defendant and the grandmother during closing arguments, and no statement that the state's attorney had made during closing arguments furthered any potential prejudice that could have resulted from the improper question posed to the defendant during cross-examination.

(Internal quotation marks omitted.) *State* v. *Thompson,* supra, 266 Conn. 485, quoting *State* v. *Reynolds,* supra, 264 Conn. 165. We have cautioned, however, that "[s]uch a sanction generally is appropriate . . . only when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." (Internal quotation marks omitted.) *State* v. *Thompson,* supra, 485. Accordingly, "in cases in which prosecutorial misconduct does not rise to the level of a constitutional violation, we will exercise our supervisory authority to reverse an otherwise lawful conviction only when the drastic remedy of a new trial is clearly necessary to deter the alleged prosecutorial misconduct in the future." (Internal quotation marks omitted.) Id., 485–86. Thus, "[r]eversal of a conviction under [our] supervisory powers . . . should not be undertaken without balancing all of the interests involved: the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct." (Internal quotation marks omitted.) Id., 486.

We find it questionable whether the state's attorney acted deliberately in contravention of the trial court's ruling in posing the challenged question to the defendant. Assuming, however, that the state's attorney acted deliberately in posing the improper question at issue, we do not believe that the question was "so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal." (Internal quotation marks omitted.) Id., 485. We conclude that the circumstances do not justify the invocation of our supervisory authority in light of the minimal prejudice to the defendant as a

result of the trial court's immediate curative instruction and the significant trauma that a new trial likely would bring to T and K.

The judgment is affirmed.

In this opinion the other justices concurred.